MARTHA SHARP WARMACK AND MISSISSIPPI VALLEY TRUST COMPANY, A CORPORATION, AS TRUSTEES UNDER THE WILL OF ROBERT N. WARMACK, DECEASED, APPELLANTS, v. ANNIE LAURIE WARMACK CRAWFORD, APPELLANT, AND MARTHA SHARP CRAWFORD, A MINOR, BY JOHN L. GILMORE, GUARDIAN AD LITEM, RESPONDENT.—195 S. W. .(2d) 919.

St. Louis Court of Appeals. Opinion filed June 18, 1946.

*Forest P. Tralles,* and *Charles P. Williams,* for Martha Sharp Warmack et al., (plaintiffs) appellants.

*Fred J. Hoffmeister,* for Annie Laurie Warmack Crawford, (Defendant) appellant.

*John L. Gilmore,* guardian *ad litem* for Martha Sharp Crawford, a minor (defendant) respondent.

712

ANDERSON, J.—This is a suit filed by the Mississippi Valley Trust Company and Martha Sharp Warmack, as trustees of a trust estate created by the will of Robert N. Warmack, deceased, and praying that the court determine whether, under the provisions of the will, and under all the circumstances, they were required to sell and dispose of any portion of the stock of the International Shoe Company held by them as a part of the trust estate, and whether they would be guilty of any breach of legal duty or abuse of discretion in continuing to hold all of said stock. The defendants were Annie Laurie Warmack Crawford, testator's only child, and successor life beneficiary after the death of her mother Martha Sharp Warmack, life beneficiary and one of the trustees, and Martha Sharp Crawford, a minor child of said daughter, sole remainderman. John L. Gilmore, Esquire, was appointed by the court as guardian *ad litem* for the minor defendant.

The trial court, after a hearing, held that under the law a trustee is under a duty to distribute the risk of loss by making a reasonable diversification of investments, unless, under the circumstances it is not prudent to do so, or, by the terms of the instrument creating the trust the duty to diversify is dispensed with; that neither the circumstances in this case nor the terms of the trust instrument relieved the trustees of that duty, and that the trustees would be guilty of both a breach of legal duty and an abuse of discretion if they should continue to hold all of the said stock in its present proportion to the total corpus of the trust estate. The court then, by its decree, instructed the trustees that "within a reasonable time, and in such fashion as to avoid depression of the market and loss from too rapid liquidation, so far as practicable, they should sell for cash such number of shares of the common stock of the International Shoe Company now held by the trust estate as in their sound discretion they believed they should, and reinvest the proceeds of such sales, so as to bring about a sound diversification of the assets of the trust estate . . . "

Also, by said decree, the court allowed Charles P. Williams and Forest P. Tralles, counsel for the trustees, the sum of $1,000 each as compensation for services rendered; allowed Fred J. Hoffmeister, attorney for defendant Annie Laurie Warmack Crawford, the sum of $150.00 as compensation for services rendered; and allowed John L. Gilmore, the guardian *ad litem* of the infant child Martha Sharp Crawford, the sum of $6,500.00 as compensation for his services as such guardian.

The evidence shows that the Roberts, Johnson and Rand Shoe Company was organized in 1898. At that time Robert N. Warmack

was employed by said company as a salesman, with a territory in Tennessee. In 1901 he was made a director, but continued to travel for the company as a salesman until 1908, at which time he was made sales manager of the southern division of said company.

In 1911 a combination of the Roberts, Johnson and Rand Shoe Company and the Peters Shoe Company resulted in the formation of the International Shoe Company. The capital stock of the new company consisted of 127,500 shares of common and 82,000 of preferred stock; par value of both types of shares was $100 per share. Warmack entered the employ of the new company as sales manager of the Roberts, Johnson and Rand branch of said company, and continued to occupy that position until 1921, when he retired because of ill health. He died three years later, in July, 1924.

The record of the International Shoe Company since its organization has, except for a set-back at the beginning of the late depression, been one of continuous growth and expansion. In 1911, the year it was organized, its total sales amounted to $20,000,000, and it produced 6,362,000 pairs of shoes. In 1921 sales were $73,800,000, and production amounted to 21,843,000 pairs of shoes. In 1929, total sales were $132,000,000 with a production of 54,000,000 pairs of shoes. In 1931, the total sales dropped to $86,800,000 with a production of 44,-807,000 pairs of shoes. In 1932, sales again dropped to $65,488,000, but a gain was made the next few years, the sales in 1934 amounting to $77,000,000; 1935, $83,000,000; 1936, $84,800,000; 1937, $88,000,-000; 1938, $85,000,000; and 1939, $89,000,000. The figures for 1940 were about the same as those for 1939. In 1941, the sales of the company amounted to $116,535,000, with a production of 56,609,000 pairs of shoes. The company has operated at a profit each year since its organization, and dividends have been paid each year on its stock.

As heretofore stated, the original capitalization consisted of common stock of the par value of $12,750,000, and preferred stock of the par value of $8,200,000. The company was first organized under the laws of Missouri, and operated under that charter until 1921, when it was re-incorporated under the laws of Delaware. Under the new charter, 177,643 shares of 8% prferred stock and 911,279 shares of no par common stock were issued, which, according to the testimony of Mr. Rand, chairman of the board of directors, made a total capitalization of the company of $52,548,676.35.

The company has never issued any bonds or debentures. At the time of the hearing below, all the preferred stock had been retired and paid for out of earnings. In 1921, there was a split-up of the stock, and 6 shares of new stock were exchanged for 1 share of old stock; in 1927, another exchange, this time 4 for 1, was effected.

In 1924, the dividend rate was $4.00 per share; in 1925, $5.00 per share; and in 1926, $6.00 per share. Before the split in the stock in

1927, the dividend rate on the old stock for that year was $7.00 per share. The dividends paid on the new stock were $2.00 for 1928; $2.50 for 1929; $3.00 for 1931; $2.75 for 1932; $2.00 for 1933; $2.00 for 1934; $2.25 for 1935; $2.25 for 1936; $2.00 for 1937; $1.75 for 1938; $1.75 for 1939; $1.75 for 1940; and $2.00 for 1941.

The stock of the company is listed both on the New York Stock Exchange and the St. Louis Stock Exchange. On October 23, 1925, when the trustees took over the corpus of the trust estate, the price of the stock was $186.00. In 1926, the high on said stock was $175, and the low $135. This was on the old stock, before the 1927 split. After the 4 to 1 exchange in 1927, high was $56, and low $55. In 1928, high $87, low $62; in 1929, high $79, low $55; in 1937, high $49, low $38. The company has between seven and eight thousand stockholders, with 3,350,000 shares of stock outstanding. It is recognized as the largest shoe manufacturing concern in the United States. Most of its output is sold in the United States, only about 3% of its production being exported. It has factories or supply plants in 22 cities in Missouri, 12 in Illinois, 2 in North Carolina, 5 in New Hampshire, and 1 each in the states of Arkansas, Kentucky, Pennsylvania, and West Virginia.

When Warmack came to St. Louis in 1908 to take over the position of sales manager, he had something less than $10,000, most of which he invested in stock of the Roberts, Johnson and Rand Company. Thereafter he continued to invest his savings in said company, and after 1911 in the stock of the International Shoe Company. When he died, about 90% of his estate was invested in stock of the International Shoe Company.

The will of Warmack provided, first, for the payment of his debts, the expenses of his last illness, and funeral expenses; second, for disposition of his household goods, furniture and furnishings, automobile, jewelry, and other personal effects; and, the third clause of the will devised and bequeathed all the rest and residue of his estate to the Mississippi Valley Trust Company and his widow Martha Sharp Warmack, in trust. Under the trust, his wife was to receive the entire net income of the trust estate for life, and the trustees were empowered to pay to his wife such part of the principal of the trust estate from time to time as they might deem necessary for her care, support, and comfort. It was further provided that after the death of the wife, the trust should continue for the benefit of his only child, Annie Laurie Warmack, she to receive the entire net income during her life time. Encroachment on the principal for the benefit of the daughter is authorized only in case of extremity, or, if by misfortune or unavoidable accident the value of the trust estate should become greatly diminished, then during any period of imperious necessity. It was then provided that after the death of the daughter, the residue should go to the descendants of said daughter, if any,

but the trust should continue as to the share of any minor child of the daughter until said child should reach twenty-one; otherwise, to the heirs at law of the testator, free of trust.

The will further provided that:

"The trustee or trustees under the trust hereby created shall receive, manage, and control the trust estate and the property thereof as the trustee may deem best for the interests of the beneficiaries; the trustee or trustees may, as often as it or they deem proper, bargain, sell, transfer, and deliver any securities held in trust hereunder, all for such prices and on such terms as the trustee or trustees may approve, and receive the proceeds thereof; at the discretion of the trustee or trustees from time to time it or they shall invest and reinvest funds held in trust hereunder in notes secured by first mortgage or first deed of trust, or in high grade investment bonds of any corporation of any state, or in bonds of the United States or of any state, or in bonds of any county, district, or municipality of any state; the trustee or trustees in its or their discretion from time to time may let, lease, bargain, sell, grant and convey any real estate belonging to the trust estate. The trustees or trustee shall from time to time to collect the interest, dividends, rents, and profits of and from the property and securities held in trust hereunder. . . . The trustees, without accountability for loss, may retain as investments of the trust estate, any and all real estate, or bonds, stocks, loans and other securities received in trust hereunder."

At the time this proceeding was instituted, and at the time of the hearing below, Annie Laurie Warmack Crawford was the only child of the testator. She was a widow with one child, a daughter, Martha Sharp Crawford, age 14 or 15 at the present time.

On October 23, 1925 the trust estate was delivered into the hands of the trustees. It consisted of 6,164 shares of common and 783 shares of preferred stock of the International Shoe Company, a warrant of the International Shoe Company for $28,056 for the balance due on preferred stock that had been retired, one bond of the Missouri Athletic Club, and one bond of the City Club.

In May, 1926, the trustees sold 177 shares of the common stock at $140.00 per share. The purpose of this sale was to obtain a suffcient sum to pay Mrs. Warmack the income that had accumulated during the administration of the estate. This left 5988 shares, which were exchanged for 23,952 shares at the time of the 4 for 1 split on November 28, 1927. On June 27, 1936, the trustees sold 1052 shares, leaving in the estate 22,900 shares, which the trustees have retained as a part of the corpus of the estate. These shares of stock constitute about 83 1/3% of the value of the estate. The other 16 2/3% is invested in municipal and United States Government bonds.

The 1,052 shares disposed of in 1936 were sold to Mrs. Warmack. At that time there was a discussion between her and the trust com-

pany representative concerning the matter of diversification. Mrs. Warmack had some municipal bonds of her own and said she would be perfectly willing to take over some of the International stock in lieu of the bonds. The purpose of the sale was entirely for diversification. The proceeds of this sale and the money received when the preferred stock of the International was retired were invested in the character of bonds in which the trustees were authorized to invest by the terms of the will.

The market price of the 22,900 shares of stock in the estate on May 28, 1942, the date of the hearing below, was $26.00 per share, or $595,400. Since the market value of the stock was $186.00 per share, or $1,064,850 at the time it was delivered to the trustees, which was prior to the 4 to 1 split, there occurred a depreciation in the value of the stock between the date it was turned over to the trustees and the date of the hearing of $469,450. Appellants in their brief, filed in this court on December 6, 1945, state that "at the present time the stock has appreciated to approximately $44.00 a share." We, of course, cannot take notice of this fact, but, if true, the depreciation in the value of the stock which was reflected by the market value as of the tail end of the late depression has been largely wiped out by an upward swing of the market. This is not unlikely, in view of the improved economic conditions now prevailing over that which existed at the time of the hearing, a fact of which we can take notice.

C. A. Tolin, assistant trust officer of the Mississippi Valley Trust Trust Company, who has the Warmack trust under his control and supervision, testified that it was the policy of his company to diversify the investments of trust estates under their control, but the percentage that would be regarded as the maximum for investment in one company would depend upon the investment powers granted by the trust instrument. He stated that when the trust instrument granted power to the trustee to invest in common stocks, the percentage they would place in one company or in any one industry would depend upon conditions. That there were times when they would not buy common stock at all, and other times when they would invest as high as 20% of the trust estate in common stock, which would be approximately the maximum figure, the balance being put in various other securities permitted by the trust instrument. He further testified that where the trust instrument confines the trustee to a few (types of) investments, they carry a much larger percentage of common stock.

He further testified that although his company had constantly communicated with Mrs. Warmack regarding diversification of the investments of the trust in question, they had never submitted any definite proposition to her because she had never agreed to sell any substantial amount of the stock, and that their only object in consulting with Mrs. Warmack was that from their standpoint they wanted

718

to diversify; that they felt it was the prudent thing to do in the management of the estate. He further testified that Mrs. Warmack took up the matter with her attorney, and her attorney agreed with her that they did not have to diversify, with the result that they had not done so.

The following questions and answers appear in the transcript of this witness' testimony:

"Q. You think eighty-three per cent of the trust fund of the estate invested in one industrial company is too large a percentage? A. There is no rule to go by, but individually I think it is pretty large unless we have some protection.

"Q. You think it is extremely large? A. I cannot give you any rule because of the investment powers in the instrument. . . . I do not think our committee will object to fifty percent common stocks in an estate where your hands are tied, and you do not have a broad list to buy from.

"Q. That motivates you, the fact you can sell this common stock, and cannot reinvest in common stock, that motivates you to some extent? A. Yes.

"Q. From your experience investing trust funds for a large institution like the Mississippi Valley, will you tell the court the percentage of loss that are sustained in investments generally where the money was placed in common stocks during the past, from 1925 to 1942? A. I don't have those figures available.

"Q. Well, you—could you approximate it? Would it run fifty percent or more or less? A. Well, from the high, I think it would run fifty percent, all depending on the class of stocks you purchase.

"Q. Assuming they were high-grade stocks, like the Mississippi would purchase for trust estates, where they had the power? 'A. It would run in the neighborhood of fifty percent.

"Q. That is, assuming that the stocks were diversified? A. Yes."

The witness further testified that the reasons the trustees did not diversify the investments in the trust estate in question was, first, because of the provision in the will empowering the trustees to retain stocks that came into their hands under the will, and, secondly, because the trustees were not given broad investment powers by the will; that Mrs. Warmack persuaded the trust company to retain the stock; that had the trust company been acting alone, they would have sold a sufficient amount of the stock so that they could look at the trust estate and say "that is diversified"; but that there are times, with an instrument like that (Warmack's will) that their committee thinks fifty percent common stock is not out of proportion.

The witness further testified that at the time of the trial high grade municipal bonds yielded around 2%, and high grade corpo-

ration bonds yielded from 2-3/4% to 3%. The yield of the invested capital in the trust estate at that time was between 5½% to 6%.

Mrs. Warmack, life beneficiary of the trust, testified that the retention of the International Shoe Company stock by the trustees met with her approval; that she had complete confidence in the company, and that it was her wish that the trustees retain all of the stock as a part of the trust investment. Mrs. Warmack herself was the owner of 13,000 shares of International stock at the time of the hearing below.

Mrs. Annie Laurie Warmack Crawford, the successor life beneficiary, testified that the retention of the stock by the trustees met with her full approval both on behalf of herself and her daughter. She further testified that she and her daughter, the eventual residuary beneficiaries of the trust, were both provided for independently of this trust. She stated that she received a larger income than her mother does, and that the provisions for her daughter were very much greater than the entire Robert N. Warmack trust estate.

The practice of diversification of investments is quite generally recognized as a sound investment policy in financial circles, and has been adopted into a rule of trust management law in a few jurisdictions. [Davis's Appeal, 1903, 183 Mass. 499, 67 N. E. 604; Dickinson's Appeal, 1890, 152 Mass. 184, 25 N. E. 99; In re: Ward's Estate, 1936, 121 N. J. Eq. 555, 192 A. 68, aff. 121 N. J. Eq. 606, 191 A. 772; Tenn. Code Ann. (Michie) 1938, Par. 9596; Wis. Statute, 1939, Par. 320.02. It has been rejected in Pennsylvania, In re: Saeger's Estate, 1940, 340 Pa. 73, 16 A. (2d) 19. The majority of decisions in New York deny the existence of such rule. In re: First National Bank of the City of New York, 1941, Sup., 25 N. Y. S. (2d) 221; In re: Gottschalk's Estate, 1938, 167 Misc. 397, 4 N. Y. S. (2d) 13; In re: Matter of Sheldon, 1936, 160 Misc. 194, 289 N. Y. S. 887; In re: Balfe's Will, 1934, 152 Misc. 739, 274 N. Y. S. 284, aff. 245 A. D. 22, 280 N. Y. S. 128; In re: Adriance's Estate, 1932, 145 Misc. 345, 260 N. Y. S. 173.]

It may be desirable to make the investment policy of diversification a legal standard in order to provide greater security for trust funds. There are strong arguments in favor of such a rule. However, no such inflexible rule has been adopted by the courts of this State. Our courts have not declared that the practice of diversification is a legal standard to be enforced in a particular case as a matter of law regardless of all the other facts and circumstances appearing. Nor is it necessary to decide in this case whether such a rule does or does not exist.

The will creating the trust in this case provides: ''The trustees, without accountability for loss, may retain as investments of the trust estate, any and all real estate, or bonds, stocks, loans, and other securities received in trust hereunder.'' By inserting the foregoing

clause in the will, the testator must have intended to grant to his trustees a free discretion with reference to the retention of securities, unhampered by any arbitrary rules of trust management which would ordinarily be applicable if the will were silent as to such matter. The language of the clause quoted is not narrow. It does not, as respondent contends, limit the discretion of the trustees to a retention only if the ordinary requirement of diversification is complied with. If that had been the testator's intention, it would have been simple for him to have said so. The langauge is general, not limited. It gives discretion to retain "any and all," and not such as might be left after the application of the rule of diversification. These are words of broad discretion and, when considered in connection with the facts and circumstances shown in evidence, including the fact that at the time the will was drawn practically all of the testator's savings were invested in the stocks in question, must be construed as relieving the trustees of the duty to diversify, if, in their discretion, exercised in good faith, the securities in question are otherwise proper.

Our view is in accordance with the general rule as stated in 1 Restatement of the Law of Trusts, Sec. 228 (f). It is there said:

"f. Terms of the trust. By the terms of the trust the requirement of diversification may be dispensed with. This may be either by a mandatory direction to the trustee to invest the whole or a specified part of the trust property in a particular security or type of security, or by permission to the trustee so to do. In the case of a mandatory direction the trustee is not liable for making investments in accordance therewith, except as provided by Secs. 165-167. In the case of a permission to the trustee, he is not liable for making investments in accordance therewith unless he abuses the discretion conferred upon him by the terms of the trust (see Sec. 187), or fails to act with prudence (see Sec. 227)."

The trustees by their petition requested the court to determine "whether (1) under the provisions of the will, and under all the circumstances, they were required to sell and dispose of any portion of the stock of the International Shoe Company held by them as aforesaid; and (2) whether they would be guilty of any breach of legal duty or abuse of discretion in continuing to hold all of said stock." The trial court by its decree, answered said questions as follows:

"It is the judgment of the court that under the facts and the law herein said trustees would be guilty both of a breach of legal duty and also an abuse of discretion if they should continue to hold all the aforesaid stock of the International Shoe Company in its present proportion to the total corpus of the estate."

The basis of the court's ruling was that a trustee is under a duty as a matter of law to diversify the investments of his trust estate, and

that the language of the Warmack will did not relieve the trustees in the case at bar from that duty.

The court erred. The court should have advised the trustees that under the terms of the will they were not required to sell and dispose of any portion of the stock of the International Shoe Company unless it appeared to them that said stock was not such an investment as a prudent man would make, having primarily in view the preservation of the estate, and the amount and regularity of the income to be derived. [Rand v. McKittrick, 346 Mo. 466, 142 S. W. (2d) 29; St. Louis Union Trust Co. v. Toberman, 235 Mo. App. 559, 140 S. W. (2d) 68; Fairleigh v. Fidelity Nat. Bank & Trust Co. of Kansas City, 335 Mo. 360, 73 S. W. (2d )248.] In determining this matter, the question of diversification need not be ignored, but it is not a controlling factor. The whole thing rests within the sound discretion of the trustees. They alone can exercise it. They cannot shift the duty to the Court. The Court can interfere only where there is an abuse of that discretion.

It is next urged that the allowance of $6,500.00 as a fee to John L. Gilmore is excessive. Considering the amount of work performed by Mr. Gilmore, the size of the trust estate, and the question of law involved, we are of the opinion that the allowance is not excessive.

The judgment of the trial court is reversed, and the cause is remanded with directions to the trial court to enter a new judgment in conformity with the views herein expressed. *Hughes, P. J.,* and *McCullen, J.,* concur.