ERNEST STEINER, TRUSTEE OF THE INTER
VIVOS TRUST CREATED BY INDENTURE OF
TRUST OF WHICH MARY MAPUANA PETERS
AND EMIL CORNELIUS PETERS, HUSBAND
AND WIFE, WERE THE SETTLORS AND THE
HAWAIIAN TRUST COMPANY, LIMITED, A
HAWAII CORPORATION, WAS THE TRUSTEE
AND EMIL CORNELIUS PETERS, JR., IS THE
PRINCIPAL BENEFICIARY, DATED SEPTEM-
BER 8, 1931, AS AMENDED BY INDENTURE OF
DECEMBER 31, 1943 *v.* HAWAIIAN TRUST COM-
PANY, LIMITED, A HAWAII CORPORATION.

Nos. 4274, 4275, 4276.

May 28, 1964.

Tsukiyama, C. J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

OPINION OF THE COURT BY WIRTZ, J.

These are actions for breaches of trust brought by plaintiff-appellee as successor trustee against defendant-appellant, the former trustee, involving three separate but identical trusts. The cases were consolidated at the trial and have been considered together on appeal.

After trial, judgments were entered surcharging defendant for breach of trust. From these judgments defendant has brought this appeal.

On September 8, 1931, E. C. Peters and his wife established trusts for each of their three children as beneficiaries with defendant as trustee. The corpus of each was 100 shares of stock of Hawaiian Pineapple Company,

Limited.[1] The trustee was authorized to hold these initial shares of stock of Hawaiian Pineapple Company, and "all proceeds thereof and all property whatsoever into which the same may, or any part thereof, at any time or times be resolved by investment, reinvestment, exchange or otherwise."

The trusts were revocable. They gave the trustee the power "to invest and reinvest the personal property of the trust estate and to vary the securities in which the same from time to time may be invested," but conditioned this investment power in the following manner:

> "Nor shall the personal property of the trust estate be reinvested or varied by the trustee during the lifetime of the settlors or the survivor of them and while they are respectively sui juris, without their, his or her previous written consent thereto."

The settlors reserved the right to remove and change the trustee at will.

On May 28, 1935, Judge and Mrs. Peters created another trust of the bulk of their assets, naming themselves as beneficiaries and defendant as trustee. After the death of his wife Judge Peters, on January 1, 1944, transferred the assets of the 1935 trust to the 1931 trusts in three equal parts. Just prior thereto, on December 31, 1943, the 1931 trust instruments were amended so as to make them irrevocable.[2] By the transfer made on January 1, 1944,

---

[1] Throughout the existence of the trusts the corpus of each was nearly identical to that of the others with the exception that $1,500 was distributed to the son, E. C. Peters, Jr., in 1955 pursuant to the terms of that trust instrument.

[2] The amendment provided that the "surviving Settlor shall not hereafter have the right to shift or to effect a partial or complete alteration of the economic benefits of the trust * * *." In the amendments to the 1931 trust instruments the trustee was also given full power to sell, free from the requirement of prior consent of the settlors (1) whenever trust income was insufficient to provide proper maintenance and support of the beneficiary and (2) whenever an emergency or illness occurred. In the latter instance, the decision to invade principal and the extent of the invasion was left to the decision of the trustee.

each of the 1931 trusts received the following additional assets with the corresponding values:

| | |
|---|---:|
| 1228 shares of Hawaiian Pineapple Company, Limited | $27,016.00 |
| 50 shares of Bishop National Bank of Hawaii | 1,725.00 |
| 8 shares of Bank of Hawaii | 1,920.00 |
| 8 shares of Hawaiian Agricultural Company, Limited | 192.00 |
| 21 shares of Hawaiian Trust Company, Limited | 2,835.00 |
| 16 shares of Pepeekeo Sugar Company, Limited | 352.00 |
| 8 shares of Waianae Company, Limited | 48.00 |

These shares, coupled with the 68 shares of Hawaiian Pineapple Company, which had replaced the original 100 shares of the predecessor corporation,[3] together with a small amount of cash, brought the corpus of each trust to a total value of over $35,610.00 with a total value of the three trusts in excess of $107,000.00. Over 80% of the $107,000.00 was invested in stock of Hawaiian Pineapple Company and over 99% of the total corpus was invested in stocks of local corporations in the main concerned with local produce.

The settlor at the time of the foregoing transfer told the trustee that he wished the stock in Hawaiian Pineapple Company to be retained and the chancellor found

---

[3] In 1932, shortly after the 1931 trusts were created, Hawaiian Pineapple Company went through reorganization. On February 21, 1933, the original 100 shares of Hawaiian Pineapple Company (incorporated in 1901) in each trust were replaced with 100 shares of Pineapple Holding Company, the successor to Hawaiian Pineapple Company. On December 30, 1932, Hawaiian Pineapple Company was incorporated and on November 12, 1935, the 100 shares of Pineapple Holding Company in the trusts were replaced with 66 shares of the new corporation. In 1937 the trustee exercised stock rights to purchase two additional shares for each trust bringing the total to 68 shares of the new corporation.

that the same request was repeated "on various occasions after that." The trustee retained these assets of the trusts intact until 1955.

In 1951 Hawaiian Pineapple Company had suspended its dividend, whereupon officials of the trustee called a meeting of the three beneficiaries of the trusts to point out that the assets of the trusts should be diversified but that such diversification should not be started at that time since it would be unwise to start selling the stocks when the prices were dropping. In 1955 another meeting with the three beneficiaries of the trusts was had and they were advised that it was then an appropriate time to begin diversifying the assets. A program of reduction of Hawaiian Pineapple Company and the other agricultural stocks and the elimination of Hawaiian Trust Company stock in all three trusts with investment of the proceeds in the trustee's Common Trust Fund "A", a diversified mutual fund, was approved by the three beneficiaries.

Following the 1955 meeting defendant sold 500 shares of Hawaiian Pineapple Company (price $16 for 400, $15.75 for 100), 105 shares of Hawaiian Trust Company[4] (price $33), 16 shares of Pepeekeo Sugar Company (price $6.50) and 8 shares of Hawaiian Agricultural Company (price $13.625) from each of the trusts of the two daughters; and 400 shares of Hawaiian Pineapple Company ($16 for 300 shares, $15.875 for 100 shares) and 105 shares of Hawaiian Trust Company[4] (price $33) from the trust for Judge Peters' son. It had sold in early 1955 the other agricultural stocks and some Hawaiian Pineapple Company stock from the son's trust for the benefit of E. C. Peters, Jr., in accordance with the terms of the trust instrument when he had needed extra funds. All of the proceeds from

---

[4] The total number of such shares then in each trust as a result of stock splits and dividends since January 1, 1944.

these sales in June and July of 1955 were invested in defendant's Common Trust Fund "A".

At no time did defendant attempt to get the prior consent of Judge Peters, the surviving settlor of the trusts. Nor did it regard such as necessary, having "overlooked" the prior consent of the settlor provision in the trust instruments. On November 2, 1956, immediately upon discovering the error in selling without the surviving settlor's prior approval, an officer of defendant called on Judge Peters to inform him of the error and to obtain his written approval of the sales. The Judge would not give an unequivocal answer then or at a further conference held on November 8, 1956. These talks were followed by delivery of a letter of November 19, 1956, in which defendant requested the consent of Judge Peters, the surviving settlor, to the sales or in the alternative to reverse the sales and restore the shares sold. Defendant also offered in this letter to compensate the trusts for any loss of income during the period between the sale of the trust securities and their repurchase. In his reply of November 21, 1956, Judge Peters was noncommittal. On November 26, 1956, Judge Peters by written instrument removed defendant as trustee and appointed plaintiff in its place.

On November 28, 1956, defendant turned over to plaintiff the remaining stock and cash assets of each of the trusts and again offered "to restore to [each] trust estate the investments sold by us without the Settlor's approval and to make the trust estate whole with respect thereto," or in the alternative to make a cash payment of the value of the Common Trust Fund. By letter dated December 5, 1956, plaintiff requested further time to consider the alternatives proposed. On December 11, 1956, plaintiff accepted the net proceeds of the conversions of the units of the Common Trust Fund.

On April 11, 1957, plaintiff made written demand that defendant pay damages for the losses incurred by the three trusts. The three suits were filed on April 8, 1958. Meanwhile plaintiff had sold the remaining shares of Hawaiian Pineapple Company at prices ranging from $13 to $11.50 during the last part of 1956 and January of 1957.

In these suits plaintiff claimed breaches of trust by defendant (1) for selling stock in itself held by each trust to its own president and to Castle & Cooke, Limited, a large stockholder of defendant; (2) for selling the various stocks above listed from the trust in 1955 without the prior consent of the settlor in violation of the trust document; and (3) for retaining various stocks in each trust (namely, stock of Hawaiian Pineapple Company, Hawaiian Agricultural Company, Pepeekeo Sugar Company and Waianae Company) beyond a reasonable time after January 1, 1944, alleging these stocks were speculative, risky, and not properly diversified, being concentrated in one industry in one geographic location involving primarily one company and a single product. The prayer was for recovery of losses thereby sustained and for the return of the commissions received by defendant on income collected.

In granting plaintiff relief the chancellor first found that defendant was guilty of breach of trust in selling stock in itself to its president and to Castle & Cooke, a large stockholder of defendant. Secondly, he found defendant guilty of breach of trust for selling the various securities from the trusts in 1955[5] without the prior consent of the settlor in violation of the trust document,[6] and finally the chancellor concluded that soon after January 1, 1944, defendant should have requested the settlor

---

[5] Excluding those properly sold on behalf of E. C. Peters, Jr., as above noted.

[6] This admitted breach of trust, however entailed no additional losses to the trusts so as to affect the surcharge imposed.

(Judge Peters) to give his consent to the sale from each trust of all of the Hawaiian Pineapple Company stock except 300 shares, and of the 16 shares of Pepeekeo Sugar Company, and its failure to do so was a breach of trust in that defendant did not attempt to obtain such consent or court approval for such sales within a reasonable time after January 1, 1944, namely within the ensuing three years. The chancellor accordingly surcharged the defendant for the losses in principal to the beneficiaries resulting from : the sale of the stock in itself to its president and to a principal stockholder; the failure to sell the Hawaiian Pineapple Company stock within a reasonable period of three years after January 1, 1944 when it should have been sold for at least $22 a share; a like failure to sell the Pepeekeo Sugar Company stock when it should have been sold for $19 a share. In all instances except the transaction involving the Pepeekeo Sugar Company stock, the surcharge was limited to losses in principal, the chancellor having found no loss of income during defendant's stewardship, and the defendant was allowed to retain the commissions received as trustee. In the case of Pepeekeo Sugar Company stock the chancellor further found a loss of $92.95 in each trust of income attributable to the improper retention of that stock and surcharged defendant in that amount.

There is no dispute as to what occurred. The contentions are centered on the conclusions drawn therefrom.

The first five specifications of error deal with the question of prudent business judgment in investment management policies, including diversification, the effect of the trust provisions thereon and the duties of fiduciaries in relation thereto. These specifications present the primary subject matter of review and will be considered at length later. The sixth specification of error was that the trial court erred :

"In holding that appellant [defendant] was liable for the increase in value of 105 shares of Hawaiian Trust Company sold from each trust in 1955, when appellant [defendant] had offered the settlor and appellee [plaintiff] to restore said shares to the trust and they elected to take the cash proceeds of the value of the assets to which said shares had been converted."

This presents the question whether or not a corporate trustee can sell stock in itself from a trust it manages to its president and to one of its principal stockholders and will be dealt with initially. In order to focus attention on the affirmance or ratification claimed in defense it is advisable to recreate the surrounding circumstances.

On November 2, 1956, defendant notified the surviving settlor of its error in selling the various stocks in 1955, including the stock in itself, without his prior consent. It followed this with a letter on November 19, 1956, offering to restore the shares or their cash equivalent if the settlor would not consent to the sale. The settlor sent the defendant an equivocal reply on November 21 and removed it as trustee on November 26.

On November 28, 1956, defendant made a similar offer to plaintiff, the successor trustee. Plaintiff replied in writing asking for time to consider the alternatives. Defendant allowed the additional time and on December 11, 1961, plaintiff by letter accepted the net proceeds in the following language:

"I am agreeable, subject to qualifications hereinafter reserved to accept the net proceeds of the conversion of the units of your Common Trust Fund 'A' held as assets in the respective trust estates in lieu of restoration as offered in your letter of November 19th last to Judge Peters.

"The within is without prejudice to my denial of

the truth of the statements contained in your favors to me and those contained in your letter to Judge Peters nor from claiming that the securities, of the proceeds of sale of which the units in the Common Trust Fund 'A' were acquired should have been sold by you at an earlier date." (Def. Ex. 28.)

Defendant contends that this was an unqualified affirmance of the sales, the only reservation being the claim that the securities should have been sold at an earlier date, there being no reservation of any claim because of the manner of the sale of the Hawaiian Trust Company shares.

After a full consideration of the facts and the testimony of the witnesses, the chancellor found (and defendant admits) that defendant had sold stock in itself from each of the 1931 trusts to defendant's president (who however was semi-active due to age and approaching retirement) and to Castle & Cooke, a large stockholder in defendant without the settlor's consent; that defendant while handling the sales through an independent broker bought the stock for these purchasers through its own Stock and Bond Department pursuant to a standing order with this broker who received all the commissions; that defendant processed the transaction through its own Stock Transfer Department; that defendant had sent letters to plaintiff offering to reverse the sale and restore the stock, including the stock in itself which had been sold, and that on December 11, 1956, plaintiff accepted cash instead of having the stock replaced; that after plaintiff had accepted the proceeds of the shares plaintiff made further inquiries and for the first time ascertained the identity of the purchasers; and that the stock in defendant was of good quality and defendant gave no reason for selling it. It further appears that defendant had a long-standing rule that no officer or employee might purchase from or sell to a fidu-

ciary account. The chancellor determined that defendant, apart from its duty under the terms of the trusts to secure the settlor's prior consent, had a further duty not to sell the stock to its own officer or to a stockholder but if it did so it had a duty to disclose all relevant and material facts surrounding the sale. Failure to perform either duty was a breach of trust. The chancellor further found that in its offers to restore the stock defendant had "omitted" the significant facts surrounding the sale which it was encouraging plaintiff to affirm.[7] Defendant was held liable for the difference between the proceeds of the reinvestment and the price of the Hawaiian Trust Company stock at the time the successor trustee took over, or $50.81 in each trust.

It is elementary that a "trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." Restatement (Second), *Trusts,* § 170 (1959). This, of course, precludes a trustee from dealing with trust assets to his own advantage or benefit.

2 Scott, *Trusts,* § 170.2 (2d ed. 1956), states at page 1198:

> "It is well settled both in England and in the United States that a trustee who has power to sell trust property violates his duty to the beneficiaries if he sells the property to himself without their consent, even though the transaction is in other respects entirely unobjectionable."

See also comments to subsection (1), Restatement (Second), *Trusts,* § 170 (1959); Bogert, *Trusts and Trustees,* § 543 (2d ed. 1960). It follows that a corporate trustee cannot sell trust property to one of its officers without

---

[7] Such facts were the full range of alternatives, i.e., the option to consent to a portion of the sales, to have the Hawaiian Trust Company stock restored regardless of what might be done as to the other stock, and the names and identities of the purchasers.

consent.

Neither the plaintiff, as successor trustee, nor the beneficiaries, let alone the surviving settlor were in possession of all the relevant facts so as to be in a position to affirm the transaction.

In 2 Scott, *Trusts,* § 216.3 (2d ed. 1956) at pages 1599-1600, the author states:

> "Even if the beneficiary is sui juris, his consent [to a trustee's improper act] will not preclude him from holding the trustee liable unless when he gave his consent he had knowledge of all relevant facts that the trustee knew or should have known and of his legal right. Even if he does have knowledge, he is not precluded if his consent was induced by improper conduct of the trustee."

Although the beneficiaries had given their prior consent to the sale of the Hawaiian Trust Company stock, they at no time consented to a sale of this stock to the president of defendant. The acceptance by plaintiff, as successor trustee, of the cash equivalent instead of restoration under the circumstances hereinabove outlined, could hardly be regarded as "an unqualified affirmance of the sales."

In view of the foregoing there was no affirmance of the sale or a release by plaintiff on behalf of the beneficiaries of defendant's breaches of trust in the sale to its own officer. No error was committed by the chancellor in holding defendant liable for the losses of principal to each trust in respect to the sales of 32 shares from the three trusts to this officer.

As to the sale of 283 shares from the three trusts to Castle & Cooke, a stockholder in defendant, while the chancellor found that Castle & Cooke owned 5,364 shares of the outstanding 83,080 shares of Hawaiian Trust Com-

pany, there was no evidence as to the control exerted by Castle & Cooke over the affairs of the defendant by virtue of such stock holding. At least as to a sale made on a stock exchange through brokers who do not reveal their principals, something more should appear than the mere fact of substantial holding by the purchaser of the trust company stock. The finding that defendant had a duty not to sell this stock to this stockholder is unsupported by the evidence and defendant would be entitled to a new trial on this point.

We come now to the principal issue under this appeal, which is whether or not the chancellor erred in imposing liability on the trustee for improperly retaining the stock in Hawaiian Pineapple Company, delivered to it by the settlor on January 1, 1944, beyond a reasonable time thereafter. This can only be resolved by an examination of the trust instruments and the conduct of the settlor and the trustee in the light of applicable law.

The instrument expressly provided that the securities shall not be "varied by the trustee during the lifetime of the settlors * * * without their * * * previous written consent."

The broad scope of a trustee's duties to the beneficiaries regarding the making and retention of trust investments is established by R.L.H. 1945, § 8661(d), originally enacted as Act 45, § 5, Sp. S.L.H. 1933, which provided:

"(d) *Business Judgment.* Nothing in this chapter contained shall operate to relieve any trust company acting as trustee or guardian from liability for failure to use prudent business judgment in making or continuing to hold any investment of trust funds."

This was the statute in effect during the crucial period from 1944 through 1946 determined by the chancellor to be the reasonable time within which the trustee should

have acted. In 1947, Act 125 (now R.L.H. 1955, § 179-14), while repealing R.L.H. 1945, § 8661(d), did not abolish the "prudent investment rule" but went on to explain it in more detail in the following language:

"§ 179-14. *Investments*. (a) Fiduciary accounts. In acquiring, retaining, exchanging, selling, investing, re-investing and managing property of another, including investments for the account of their trusts by trust companies acting as trustees or guardians, a trust company shall exercise the judgment and care which, under the circumstances then prevailing, men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds and property considering both probable income and probable safety of capital. Within the limits of this standard, a trust company as fiduciary may acquire and retain every kind of property * * * specifically including * * * corporate stocks, preferred or common, and may retain property, properly acquired without limitation as to time and without regard to its suitability for original purchase. Nothing herein contained shall authorize a departure from or variation of, the express terms or limitations set forth in the instrument creating the fiduciary relationship * * *."

As stated by defendant these statutes merely declare the "prudent investment rule" which is the general rule in most states. See Bogert, *Trusts and Trustees,* § 612 (2d ed. 1960); 3 Scott, Trusts, § 227.13 (2d ed. 1956). This "prudent investment rule" as evolved in the decisional law has formed the basis of sections 227, 228 and 230 of the Restatement (Second), *Trusts.*

In the absence of specific directions in the trust instrument as to the investment of trust funds the trustee's

duties to the beneficiaries are controlled by the statute above cited. Such statute is in effect a codification of the "prudent investment rule" and represents legislative attempts to define or at least provide some guidelines for the type and quantity of investments which a trustee may permissibly make or retain. This rule was initially stated in the leading case of *Harvard College* v. *Amory*, 9 Pick. 446, 461 (Mass. 1830) as follows:

> "* * * [A trustee must] observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested."

Thus, by statute, defendant as trustee was not only bound to the duty of exercising the prudence of a reasonably prudent businessman but was also bound to use the higher degree of skill that it possessed as an expert professional fiduciary. Restatement (Second), *Trusts*, § 174 (1959). The standard is absolute and is not obviated or lessened because a particular breach was honest and well-intentioned.

Under the broad duty to act as a "reasonably prudent businessman," it is the specific investment duty of a trustee to diversify trust investments unless absolved from so doing by express direction in the trust instrument, such as a mandate to retain specified assets. This duty is imposed in the expectation that it will minimize the possibility of large losses of capital through the failure of only one of the investments in the entire portfolio. Prudence requires a careful and cautious balance between the quantity and quality of the securities held in trust so as to spread the risks of investments, bearing in mind "both probable income and probable safety of capital." In this regard Sec-

tion 228 of the Restatement of *Trusts* (Second) provides:

"Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary to distribute the risk of loss by a reasonable diversification of investments, unless under the circumstances it is prudent not to do so."

Comment b to this section notes:

"In making a diversification of investments the trustee should consider among others the following factors: (1) the purposes of the trust; (2) the amount of the trust estate; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) the dates of maturity."

Similar positions have been taken adopting much the same reasoning by the leading text writers in the field of trusts. 3 Scott, *Trusts*, § 228 (2d ed. 1956); Bogert, *Trusts and Trustees*, § 612 (2d ed. 1960).

While at first blush it may appear that there exists a split of authority in the cases on the question of diversification since a number of cases have refused to surcharge the trustee for failing to diversify, still diversification is a vital fact of prudent investment policy and it is only in connection with the extent of diversification that there are differences of opinion depending upon the particular circumstances of the case. See *Annot.,* 131 A.L.R. 1158.

Many courts have adopted the Massachusetts rule that a trustee is ordinarily under a duty to diversify trust investments, and have surcharged trustees for failure to reasonably diversify where the investment in one type of security has been substantial. *Dickinson's Appeal,* 152 Mass. 184, 25 N.E. 99; *Davis' Appeal,* 183 Mass. 499, 67 N.E. 604; *Warren* v. *Pazolt,* 203 Mass. 328, 89 N.E. 381;

*In re Sanders,* 304 Ill. App. 57, 25 N.E.2d 923; *In re Ward,* 121 N.J. Eq. 555, 192 Atl. 68, *aff'd* in 121 N.J. Eq. 606, 191 Atl. 772; and *cf., Commercial Trust Co.* v. *Barnard,* 27 N.J. 332, 142 A.2d 865; *Pennsylvania Co.* v. *Gillmore,* 142 N.J. Eq. 27, 59 A.2d 24.

California has adopted the same position. In *Mandel* v. *Cemetery Board,* 185 Cal. App. 2d 583, 8 Cal. Rptr. 342, the trustee of a cemetery endowment fund trust invested nearly 80% of the capital of the fund in the note and deed of trust of a single obligor. The court held that the trustee should be required to reinvest the fund so as to produce diversification under the "prudent investment rule." The court stated at page 587:

> "Clearly, the respondent could find that a trustee exercising the care and skill of an ordinary prudent man would not invest more than three-fourths of his funds in one security, as in the present case. In other words, an essential part of the 'prudent investors' rule is the requirement that investments be diversified."

See also *Day* v. *First Trust & Savings Bank of Pasadena,* 47 Cal. App. 2d 470, 118 P.2d 51; *In re Bouffleur,* 26 Cal. Rptr. 173.

Cases in still other different jurisdictions generally supporting this view are: *Knox County* v. *Fourth & First Nat. Bank,* 181 Tenn. 569, 182 S.W.2d 980; *Indiana Trust Co.* v. *Griffith,* 176 Ind. 643, 95 N.E. 573; *People's State Bank & Trust Co.* v. *Wade,* 269 Ky. 89, 106 S.W.2d 74; *Durant* v. *Crowley,* 197 App. Div. 540, 189 N.Y. Supp. 385, *aff'd,* 234 N.Y. 581, 138 N.E. 455; *Cobb* v. *Gramatan Nat. Bank & Trust Co. of Bronxville,* 261 App. Div. 1086, 26 N.Y.S.2d 917, *reargument denied,* 262 App. Div. 745.

According to the Restatement of the Law of Trusts (Second), § 230, comments *c* and *j,* there is no valid reason to relax the duty of diversification when the securities

are included in the trust at the time of its creation and are what is known as "inception assets." On the other hand, in 3 Scott, *Trusts*, § 230.3 (2d ed. 1956), it is stated: "The rule as to diversification is applied less strictly to the retention of investments by the trustee than to the making of investments by him. It is easier to find an intention of the creator of the trust to dispense with the requirement of diversification in the retention of investments made by him than in the making of investments by the trustee." Barring a contrary intention of the settlor explicitly expressed in the trust document prudence would seem to dictate diversification of an overly concentrated inception portfolio, the extent of such diversification being governed by the quality of the inception assets involved. See *In re Trusteeship of Stone*, 138 Ohio St. 293, 34 N.E.2d 755; *Paul* v. *Girard Trust Co.*, 124 F.2d 809 (7th Cir. 1941); *In re Lewis' Estate*, 344 Pa. 586, 26 A.2d 445; *Dickerson* v. *Camden Trust Co.*, 140 N.J. Eq. 34, 53 A.2d 225; *First National Bank of Kansas City* v. *Hyde*, 363 S.W.2d 647 (Mo. 1962). Nevertheless, it could well be that in the case of inception assets more emphasis would be placed on the quality than on the quantity of the overly concentrated inception assets.

Appellant, however, has premised its entire argument on this issue on the contention that the language contained in this trust instrument was a mandate or an authorization to retain the securities which were handed over to the trustee. It argues that "in jurisdictions in which the prudent investment rule is recognized, where the trust instrument directs or permits retention of shares, the trustee is not liable for retention unless its determination was an abuse of discretion."

In this connection the appellant contends that by the requirement of the settlor's prior written consent to rein-

vestment of the trust assets "the settlor mandated retention of these shares, or at least authorized their retention. If the language is mandatory, appellant cannot be held liable for not diversifying and for retaining the shares. If permissive, the appellant can be held liable only if it abused its discretion in retaining them." In this connection it relies principally on the cases collected in the *Annotation* in 47 A.L.R.2d 187, § 8 at page 226 and § 18 at page 266, but a closer reading of these cases makes it apparent that there a mandate to retain the securities or the settlor's desire that the securities be retained was clearly expressed which is entirely different from the present trust instrument where no such express language appears. *Cf., Warmack* v. *Crawford,* 239 Mo. App. 709, 195 S.W.2d 919; *North Adams Nat. Bank* v. *Curtiss,* 278 Mass. 471, 180 N.E. 217; *York* v. *Maryland Trust Co.,* 149 Md. 608, 131 Atl. 829; *In re Balfe's Will,* 245 App. Div. 22, 280 N.Y. Supp. 128; *Central Hanover Bank & Trust Co.* v. *Clark,* 81 N.Y.S.2d 883; *In re Pate's Estate,* 84 N.Y.S.2d 853, *aff'd,* 276 App. Div. 1008, 95 N.Y.S.2d 903, *appeal denied,* 277 App. Div. 768, 97 N.Y.S.2d 542; *In re Kilmer's Will,* 18 Misc.2d 60, 186 N.Y.S.2d 120; *Boland* v. *Mercantile-Commerce Bank & Trust Co.,* 349 Mo. 731, 163 S.W.2d 597; *Old Colony Trust Co.* v. *Shaw,* 261 Mass. 158, 158 N.E. 530; *Fortune* v. *First Trust Co. of St. Paul,* 200 Minn. 367, 274 N.W. 524; *In re Mereto's Estate,* 373 Pa. 466, 96 A.2d 115.

Rather than a mandate or authorization to retain trust assets the prior consent provision here was intended to curb the trustee's power of reinvestment. Under the trust instruments the settlor was given the power of prior consent to any sale of existing trust investments, whether inception assets or not. It is clear from the nature of the trust assets that the exercise of this power was for the

benefit of the beneficiaries of the trust generally and not for the benefit of the settlor alone. See Restatement (Second), *Trusts,* § 185, comment *c* (1959); 2 Scott, *Trusts,* § 185 (2d ed. 1956). Especially is this true since on and after January 1, 1944, the trusts became irrevocable. This power of veto residing in the surviving settlor rendered him, as holder of the power, just as much a fiduciary as the trustee. Restatement (Second), *Trusts,* § 185 (1959). The exercise of the powers reserved to the surviving settlor are just as much "subject to court scrutiny" as are the exercise of the powers granted under the terms of the trust instruments to the trustee. See *Fifth Avenue Bank of New York* v. *Nunan,* 59 F. Supp. 753; *Cushman* v. *Commissioner of Internal Revenue,* 153 F.2d 510 (2d Cir. 1946); *Application of Esty,* 75 N.Y.S.2d 905.

Professor Scott expresses the general rule and outlines the duty and obligations of the holder of such power of veto in these words:

"If the holder of a power of control holds it in a fiduciary capacity, the court will control him in the exercise of the power if he is guilty of an abuse of discretion or threatens to abuse the discretion conferred upon him. The principles which are applicable are those which apply to discretionary powers conferred upon a trustee. It is no abuse of discretion unless in exercising or failing to exercise the power he acts dishonestly or from an improper motive or fails to use his judgment or acts beyond the bounds of a reasonable judgment. 2 Scott, *Trusts,* § 185 (2d ed. 1956).

The Restatement of the Law of Trusts treats the duty as one similar to that owed by a co-trustee. Restatement (Second), *Trusts,* § 185, comment *e* (1959). The retention of the power of veto by the settlor is no excuse for the trustee's failure to act when the circumstances deem such

action to be proper and necessary. Nor does the fact that the settlors retained the power to remove the trustee alter the duty of diversification which the trustee owed to the beneficiaries under the "prudent investment rule." If this power to remove the trustee altered or excused the performance of the duties required of a trustee then the purpose and function of a trust status would be obviated since the settlors could dictate any action on the part of the trustee in derogation of their transfer of the trust property under the trust instrument. Under the terms of these trusts the initiative rested on the trustee to call to the attention of the holder of the veto power (the settlor) any deficiency in the investment portfolio of the trusts whenever such occurred. It is fundamental that the settlor could hardly consent before being faced with the necessity of making a decision. As stated in *Van Beuren* v. *McLaughlin,* 161 F. Supp. 944, 948: "Consent, in law, means an agreement to do something proposed by another; an assent to some proposition submitted by another." To like effect see *Mercier* v. *Holmes,* 119 Vt. 368, 125 A.2d 790; *Plummer* v. *Commonwealth,* 64 Ky. 76; *Howell* v. *McCrie,* 36 Kan. 636, 14 Pac. 257; *Locke* v. *Redmond,* 6 Kan.App. 76, 49 Pac. 670.

The Restatement of the Law of Trusts expresses the rule in this manner:

> "Where it is provided that the trustee shall act only with the consent of another, the trustee is not justified in doing nothing until such consent is given, but should undertake to obtain the consent of the other if the circumstances are such that the trustee deems that action ought to be taken."

Restatement (Second), *Trusts,* § 185, comment *g* (1959); 2 Scott, *Trusts,* § 185 (2d ed. 1956). It is the trustee's duty to seek the consent of the holder of the power to the

disposal of improper investments. The trustee should advise and counsel him and if he should still refuse to consent, the trustee was duty bound to resolve the question of the scope of his powers by securing a bill of instructions. *Cf., Kinney* v. *Robinson,* 30 Haw. 246, 257. See 2 Scott, *Trusts,* § 185 (2d ed. 1956). The fact that the holder of the power, on occasions, may have expressed his desire or wish to retain the improper securities is no excuse and the trustee could not assume that its efforts to secure consent would have been futile because of its belief that the settlor would have, in any case, refused. It is nonetheless the duty of the trustee to submit a reinvestment plan to the settlor and if rejected to seek instructions from the court. *Cf., In re Garland's Will,* 159 Misc. 333, 287 N.Y. Supp. 918.

Here, the trustee periodically reviewed the portfolios of each trust, but, despite its misgivings on retention of the overconcentration of the Hawaiian Pineapple Company stock, it was misled by a mistaken belief, as found by the chancellor, that it was relieved of responsibility by the settlor's oral requests to retain this stock.

In *Estate of James Campbell,* 38 Haw. 573, it was held that a trustee was entitled to apply to the courts for instructions as to the administration of the trust if he is in reasonable doubt as to his duties or powers as trustee.

The question here presented is: Were the reasonably perceivable circumstances existing on January 1, 1944, regarding the past and probable future quality of the shares of stock held in trust such that a reasonably prudent businessman would not have retained, beyond a reasonable time, 80% of a total of $107,000.00 of trust assets in each trust in stock of Hawaiian Pineapple Company and 99% of such total trust assets in each trust in local shares of stock?

The chancellor found that the defendant failed to take any steps towards disposing of the excessive holdings of Hawaiian Pineapple stock in each trust until 1955 and that the greater portion of such stock in each trust, that is all except 300 shares, should have been sold within a reasonable time after January 1, 1944, namely, sometime during the following three years of 1944, 1945 or 1946. He further found that had such stock been sold within such reasonable period, it would have commanded a price of at least $22 per share which was well within the range of stock sales for that period.[8] He computed the amount of the surcharge in each trust by determining the loss of principal between the $22 a share which could have been realized and the actual amount received upon the sale of 496 shares in 1955, and the value of 500 shares delivered to the plaintiff as successor trustee on November 26, 1956, at the time defendant was discharged as trustee (the balance of 800 shares less the 300 that the chancellor found could be retained). This surcharge amounted to $3,947.50 in each trust to which was added interest at 4% per annum. Since the retained stock had produced income amounting to more than a 5% return on the $22 valuation, no surcharge was made as to lost income. These findings and conclusions of the chancellor were clearly supported by the evidence and are in accord with the applicable principles of law.

Defendant has criticized the court's authorization of the retention of 300 shares of Hawaiian Pineapple stock as being inconsistent. Under the "prudent investment rule" established by statute the trustee is under a duty to dis-

---

[8] The figure of $22 represents the lowest intermediate value of Hawaiian Pineapple Company stock during the period involved. The beneficiaries might have objected that the chancellor used the lowest rather than the average value. 2 Scott, *Trusts*, § 209, pp. 1548-1549 (2d ed. 1956). But it certainly does not lie in defendant's mouth to question the chancellor's figure which is so favorable to it.

pose of the improperly diversified investments in proportion to the quality of the securities and consequently the trustee "should not be liable for the whole loss resulting from the retention of the securities, but only for the loss resulting from the retention of so many of them as were in excess of the proper proportion." 3 Scott, *Trusts,* § 228.1 (2d ed. 1956). See also Restatement (Second), *Trusts,* § 228, comment *h* (1959). Thus, it would appear that the chancellor's finding herein holding the trustee liable for only the loss occasioned by the retention of the Hawaiian Pineapple stock in excess of 300 shares is warranted as just and equitable.

It is in this connection that the chancellor's concern about the quality of the Hawaiian Pineapple stock is reflected. He made an exhaustive analysis of the factors bearing on the investment quality of the stock. Regarding the history of the company he noted that there were periods of spectacular growth followed by drastic collapse and slow rehabilitation; that although the yield had been satisfactory there was considerable instability in earnings and dividends per share; and that the history of the type and amount of outstanding stock was constantly varying and unpredictable.

From his analysis the chancellor found that there was a history of instability in market value and earnings and that long range growth was not a characteristic of the company; that in the thirteen years prior to 1944 the price of the stock fluctuated widely; that the history of the company included large deficits; that in the twelve years prior to 1944, net sales doubled but net profits remained the same and that earnings did not respond to the increase in net sales. He concluded, and reasonably so, that, due to the poor investment quality of the stock, it was not justifiable to hold more than 200 of the 1,296 shares of Hawai-

ian Pineapple Company stock (12%) more than a reasonable period after January 1, 1944, but in deference to the expressed wishes of the surviving settlor which were entitled to some consideration, the defendant would be surcharged only for holding more than 300 of the 1,296 shares (19%).

Consequently, we can only conclude, as did the chancellor, that under the "prudent investment rule" established by statute, the trust documents and the history of Hawaiian Pineapple Company, the nature of the trust investments constituted a portfolio which under qualitative and quantitative considerations, as they existed in 1944, were such that the defendant, as trustee, had a duty to consult with the surviving settlor within a reasonable time after January 1, 1944; had a duty to advise him regarding a desirable change of the trust investments through diversification by the sale of all but 300 shares of the Hawaiian Pineapple Company stock in each of the trusts; had a duty to apply to the court for instructions if consent to the proposed sale was refused. Failure to perform each of such duties resulted in a breach of trust by the defendant.

Incidental to the foregoing question of diversification is the related ruling of the chancellor that the defendant, as trustee, improperly retained the sixteen shares of Pepeekeo Sugar Company beyond a reasonable time after January 1, 1944. He held that the defendant could have sold these shares during 1944 or 1945 at $22 per share and should have sold them on April 14, 1947 at $19 per share, on which latter date the defendant's investment department had reclassified this stock in the lowest category of its investment classification schedule.[9] The surcharge was

---

[9] Defendant had an investment advisory department which reviewed and classified securities. The classifications used were: approved for investment; approved for retention (good quality) but not for purchase without special instruction; approved for temporary retention pending reclassification and sale.

based on the loss of principal between the actual sale in 1955 at $6.50 per share and the market value of $19 per share on April 14, 1947, together with the loss of income during the period these shares were held in trust.[10]

The chancellor was not so much concerned here with the fact that the Pepeekeo stock was a part of the excessive holding of securities in the trust portfolio in local, geographically speaking, corporate stocks or in only the agricultural industry, as he was concerned with its investment quality. His solicitude centered on the duty of a trustee "to make such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived. * * * It involves three elements, namely care and skill and caution." 3 Scott, *Trusts*, § 227 (2d ed. 1956). This is nothing more than a statement of the statutory "prudent investment rule." This imposes the duty to avoid noncompliance by the disposition of unsatisfactory trust assets within a reasonable time.

In considering the duty of defendant in this regard, the chancellor noted that Pepeekeo on January 1, 1944, had a history of deficits, of dividend omissions, of losses on the sale of its products, an insecure assets to liabilities ratio and a low yield on the market value of its stock. He found that defendant should have been aware of these poor investment qualities of Pepeekeo. Under the "prudent investment rule" we can only agree with the chancellor that the above danger signals could only indicate to an ordinary prudent businessman that the sale of this stock was imperative and the sooner the better.

The defendant seemingly contends that since the chancellor allowed it, as trustee, to retain the commissions on

---

[10] As in the case of the Hawaiian Pineapple Company stock we do not understand that the defendant is contesting the amount of surcharge but rather the fact of surcharge.

income received during the period covered by the breaches of trust that he in effect recognized that there were no breaches of trust. The chancellor held that this question of commissions rested in his discretion and since the beneficiaries, through the successor trustee, had been or were being compensated for the loss of principal resulting from the breaches of trust, and for the reason that there was no loss of income resulting from the breaches of trust and the trustee had performed all the necessary services in connection with the receipt and distribution of the income, the defendant would be allowed to keep the commissions on income received.

The general rule is stated in Section 243 of the Restatement of the Law of Trusts (Second) as follows: "If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation."

Comment *a* to this section states: "When the compensation of the trustee is reduced or denied, the reduction or denial is not in the nature of an additional penalty for the breach of trust but is based upon the fact that the trustee has not rendered or has not properly rendered the services for which compensation is given."

Also comment *c* provides: "It is within the discretion of the court whether the trustee who has committed a breach of trust shall receive full compensation or whether his compensation shall be reduced or denied. In the exercise of the court's discretion the following factors are considered: (1) whether the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if

there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust."

Thus, the chancellor's ruling on these commissions is a matter of discretion as seen above. We are not free to review the exercise of his discretion in the absence of an appeal on this point by the beneficiaries who are the only ones aggrieved.

The defendant makes much of the fact that nowhere in the findings concerning the defendant's action or non-action did the chancellor determine that such amounted to an abuse of discretion; that the chancellor concluded that "defendant acted in good faith at all times"; and that its failure to diversify was in good faith and merely a mistake in judgment. Defendant then confuses the issue by seemingly concluding that under such circumstances there could be no breach of trust. The petition filed herein charges defendant with various breaches of trust which were violations of a duty owed as trustee to the beneficiaries. 2 Scott, *Trusts,* § 201 (2d ed. 1956). A trustee may commit a breach of trust in various ways and one of these, of course, is to abuse the discretion vested in him. Any deviation from the terms of the trust instrument or the statute regulating investments, such as the prudent investment statute, would constitute a breach of trust even though the trustee was acting in good faith and his deviation was merely a mistake in judgment. As stated in 2 Scott on Trusts at Section 209 (2d ed. 1956):

"A very common type of breach of trust is that which occurs where the trustee fails to sell or improperly delays in selling trust property which it is his duty to sell. The duty to sell may be imposed by express directions in the trust instrument. Even though the trust instrument is silent on the matter, the trustee

may be under a duty to sell because the property is not a proper trust investment. The trustee is under a duty within a reasonable time after the creation of the trust to dispose of any part of the trust estate included in it at the time of the creation of the trust which would not be a proper investment for the trustee to make, unless it is otherwise provided by the terms of the trust or by statute."

Thus it was not necessary for the chancellor to find here that the defendant, as trustee, abused its discretion. The case does not fall in that area. The mere violation of the prudent investment statute governing trust investments constituted a breach of trust upon which liability by way of surcharge could be predicated, in the absence of investment directions expressed in the trust instrument which relieved the trustee of the duty of diversification.

Accordingly, the judgments appealed from are affirmed, except as to the sale of Hawaiian Trust Company stock to Castle & Cooke, as to which defendant is entitled to and may have a new trial, unless this error be pretermitted by the parties as *de minimus*.

*J. Garner Anthony* (*Arthur B. Reinwald* and *Robertson, Castle & Anthony* with him on the opening brief; *Robertson, Castle & Anthony* with him on the reply) and *Anderson, Wrenn & Jenks* for defendant-appellant.

*John L. Smart* (*J. Harold Hughes* and *Joseph V. Hodgson* with him on the brief) for plaintiff-appellee.