# FRANK E. MIDKIFF, EDWIN P. MURRAY, ATHERTON RICHARDS, RICHARD LYMAN, JR., and HERBERT K. KEPPELER, Trustees, Estate of Bernice P. Bishop, Plaintiffs-Appellants, Cross-Appellees *v.* BERT T. KOBAYASHI, Attorney General of the State of Hawaii, Defendant-Appellee, Cross-Appellant

## No. 5046

MARCH 6, 1973

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE LUM IN PLACE OF KOBAYASHI, J., DISQUALIFIED

300

OPINION OF THE COURT BY MARUMOTO, J.

We have two appeals here. One appeal is by Frank E. Midkiff, Richard Lyman, Jr., Herbert K. Keppeler, and Hung Wo Ching, four of the five trustees of the Estate of Bernice P. Bishop, Deceased. The other appeal is by the attorney general. The attorney general is *parens patriae* of all charitable trusts. Bishop Estate is a charitable trust.

The appeals are from an order entered by the first circuit court on June 16, 1970, in Civil No. 17913. The order was entered upon a motion filed in the cause on March 20, 1970, by Atherton Richards, the fifth trustee of Bishop Estate.

In this opinion, the word trustees, without any qualification, will be used to refer to all of the trustees of Bishop Estate; Midkiff, Lyman, Keppeler, and Ching will be referred to as the majority trustees; and Richards will be referred to as the minority trustee.

Bishop Estate owns approximately 200,000 acres of land in Kahaluu and Keauhou, North Kona, Hawaii. For the most part, the land is covered by lava and is

unproductive. Of the total acreage, approximately 2,350 acres are below Kuakini Highway. Of the acreage below Kuakini Highway, approximately 1,800 acres are between Kuakini Highway and Alii Highway, and approximately 550 acres are between Alii Highway and the seashore.

Hereafter, the area between Kuakini Highway and Alii Highway will be referred to as the mauka area, and the area between Alii Highway and the seashore will be referred to as the makai area.[1]

Sometime before November 1965, the trustees initiated a study for the development of the estate lands in Kahaluu and Keauhou, and retained Community Planning Consultants, Ltd., of Vancouver, British Columbia, to prepare a development plan. Community Planning Consultants came up with a plan, which it called "Community for Leisure — Hawaii", containing a proposal for the development of the entire makai area and about 550 acres of the mauka area, or approximately 1,100 acres, for resort and related purposes.

Hereafter, the lands embraced in the plan will be referred to as the project lands, and the development proposed therein will be referred to as the Keauhou project, or simply as the project.

At that time, the project lands were appraised at approximately $7,000,000, but the income generated therefrom was only about $16,700 per year. So, the trustees were desirous of proceeding with the project. However, in doing so, they were limited by tax considerations. They were advised by Dean William C. Warren, their special tax counsel, that for the estate to engage in land development and incidental activities might endanger the tax exempt status of Kamehameha Schools.[2] Previously, they had been advised by J. Garner Anthony, their

---

[1] In the Hawaiian language, "mauka" means toward the mountain, and "makai" means toward the sea.

[2] Kamehameha Schools is the designation of Bishop Estate for internal revenue purposes.

regular counsel, against the use of joint venture between the estate and developers because of adverse tax consequences in the light of the Internal Revenue Service ruling in the estate's transaction with Kaiser Hawaii-Kai Development Company.

In the circumstance, upon consultation with their special tax counsel, the trustees formulated a plan which involved the formation of a development corporation, conveyance of the project lands to the corporation in exchange for its capital stock and other securities of a value equal to the fair market value of the conveyed lands, and sale of 20 percent or more of the capital stock of the corporation to other persons in order to obtain the cash required for the development.

The trustees were in doubt regarding their authority to proceed with their plan. So, on November 10, 1965, they commenced Civil No. 17913 by filing a complaint in the nature of a bill for instructions in which they sought the instruction of the court on the matter.

The circuit court entered its judgment on November 19, 1965, pursuant to findings of fact and conclusions of law filed on the same day.

The judgment declared that the plan for development proposed by the trustees was in conformity with the intent of the testatrix, and that, insofar as it might be in deviation of the will, the court approved the deviation. It authorized the trustees:

(1) to form a corporation for the purpose of developing, subdividing, selling, and leasing the project lands;[3]

(2) to subscribe for the shares of the capital stock

---

[3]The judgment described the lands merely as "certain lands in Kona, on the island of Hawaii." For a more particular description, it is necessary to refer to the complaint. The complaint described the lands as "certain lands in Kona on the island of Hawaii containing approximately eleven hundred acres being portions of the land of Kahaluu and Keauhou being R.P. 6856, LCA 7713, R.P. 4475, LCA 7713, and R.P. 7844, LCA 7715." That description identifies the lands as the project lands.

of the corporation, and pay for the same in cash and other property;

(3) to convey the project lands to the corporation for the shares of the capital stock, and other securities thereof, of an amount equal to the fair market value of the lands;

(4) to lend funds to the corporation at prevailing rates of interest "as they in the exercise of prudent business judgment may determine," but not to mortgage or pledge any estate assets to secure the debts of the corporation; and

(5) to form other corporations for the purpose of developing other lands, subject to review by the attorney general and approval by the court before their formation.

The authorization for the formation of a corporation for the development of the project lands was contained in paragraph 1 of the judgment. The authorization for the formation of corporations to develop other lands was contained in paragraph 8.

A careful reading of the judgment shows that the provisions thereof, other than paragraphs 5 and 8, applied only to the corporation authorized in paragraph 1.

Paragraph 5 required the approval of the attorney general to the formation of, and the conveyance of lands and other property to *any* corporation. The requirement for the approval of the formation of a corporation included the approval of the articles of association, by-laws, and capital structure of such corporation.

The provisions applicable to the corporation authorized in paragraph 1 did the following:

(1) required the trustees to control the corporation and not to relinquish their control without the approval of the attorney general;

(2) conditioned the operation of the corporation on the trustees obtaining a ruling from the Internal

Revenue Service that their receipts of dividends and other income therefrom were exempt from taxation under the Internal Revenue Code;

(3) gave authority to the attorney general to review the operations of the corporation, the development of the project lands, and related matters;

(4) required the approval of the attorney general to the lending of funds by the trustees to the corporation; and

(5) provided for retention by the court of jurisdiction over the cause, with leave to the parties to apply for such further relief as might be appropriate.

On February 18, 1966, two trustees and a third person formed a Hawaii corporation under the name of Kamehameha Development Corporation, with an authorized capital of 1,000 shares of no par value stock, of which 750 shares were subscribed by the trustees at a total subscription price of $7,500.[4] The trustees initially paid only $1,000 on the subscription, but later paid the subscription price in full. The corporation will hereafter be referred to as KDC.

The articles of association of KDC clothe the corporation with broad powers, and do not limit its operations to the project lands.[5] However, an order of the circuit court entered on April 4, 1966, entitled "Amended Order Approving Corporation," circumscribed the land development activities of KDC to the project lands.[6] That order subjected all actions of the trustees in relation to KDC to the terms and conditions of the judgment other than the condition regarding the obtaining of a ruling of the Internal Revenue Service.

---

[4] The minority trustee was one of the incorporators.

[5] The articles of association had the approval of the attorney general.

[6] The circuit court entered its original "Order Approving Corporation" on April 1, 1966. The amendment corrected an error in the name of the corporation, from Kamehameha Kona Corporation to Kamehameha Development Corporation.

For more than two years after its incorporation, KDC was unable to obtain any participant in the proposed development.[7] Nor were the trustees able to do so.

In the meantime, without having the land conveyed to it by the trustees, KDC constructed an 18-hole golf course and made some off-site improvements in the makai area with a view to attracting investors and prospective lessees. The financing for the work, amounting to $2,779,000, was provided by the trustees, with the approval of the attorney general.[8]

On February 14, 1968, the trustees sought the approval of the attorney general for an additional loan of $2,600,000 to KDC to enable it to complete its projected work. The attorney general refused because KDC did not have "firm binding leases, agreements or commitments by hotel operators, developers or investors * * * upon which reasonable returns to the company and the estate are assured without unreasonable risk to the Estate."

Three months later, on May 28, 1968, the trustees wrote to the attorney general that they would "continue their best efforts to obtain a firm commitment from a third party not later than October 1, 1968, to invest not less than $4.5 million in the Keauhou project," and, upon failure to obtain such investor by that date, they would "sell the project without delay as a unit or in parcels to a single buyer or multiple buyers and upon such other terms and conditions as are most advantageous to the estate."

On June 18, 1968, Troy V. Post made an offer to the

[7]The minority trustee was president of KDC during that period.

[8]The financing was arranged in two stages. In May 1966, the trustees provided KDC with a line of credit in the sum of $2,000,000. When the line of credit was exhausted, the trustees funded KDC's work commitments in the sum of $779,000. The statement of facts in the special tax counsel's opinion of February 27, 1970, shows that, on December 2, 1966, the trustees voted to convey the project lands to KDC, but the attorney general indicated disapproval of the conveyance in his letter of August 16, 1967, to the trustees, inasmuch as it was the estate which provided the financing for the project.

trustees to develop all of the estate lands in Kahaluu and Keauhou below Kuakini Highway, that is, the entire mauka area and the makai area, on an equal joint venture basis with KDC or other entity acceptable to him. He prefaced the offer with the statement that it was "anticipated that with respect to most of such acreage, the underlying fee lands will be leased for a term of 55 years or longer and that little if any of the property will be sold, the final decision, however, to await further developments in the area." The terms of the offer were:

(1) that the capital of the joint venture would be the sum of $2,500,000 in cash, plus the lands mentioned in the offer, appraised at current market value, with due consideration given to the improvements made by KDC;

(2) that the appraisal would be made by two appraisers, one to be appointed by Post and one to be appointed by the trustees, and, in case the two appraisers should differ by more than 10 percent, a third appraiser would be appointed jointly as an arbitrator;

(3) that, as his share of the capital investment in the joint venture, Post would contribute $2,500,000 in cash, and, in addition thereto, would purchase from the trustees and contribute to the joint venture an undivided interest in the lands having an appraised value $2,500,000 less than the remaining undivided interest;

(4) that, on his purchase of the undivided interest in the lands, Post would not make any cash down payment but would execute a promissory note to the trustees, payable in 15 years and secured in a manner satisfactory to them other than by a first lien on the lands;

(5) that the note would bear interest at the rate of 8 percent per year for the first 3 years, to be paid

in advance on or before January 15, 1969, and for each of the subsequent years at the rate of 1-½ percent above the New York prime rate, to be adjusted annually;

(6) that the joint venture would borrow in 1969 monies needed to carry on the project, estimated at $2,000,000 for Phase I of the makai area, by mortgaging the lands or making other arrangements with respect thereto;[9] and

(7) that Post would, if necessary, provide immediate advances to KDC for operating expenses to the time of formation of the joint venture, such advances to be credited, with interest at the rate of 7 percent per year, against the cash contribution of $2,500,000 agreed to be made by him to the capital of the joint venture.

The offer also contained the following provision: "As a matter separate and apart from these negotiations, Bishop Estate will undertake, forthwith, planning and subsequent appraisals of their South Kona lands (Keei, Kahauloa and Honaunau) and will thereafter negotiate in good faith with Troy Post for a subsequent sale on a similar no down basis involving a portion of the acreage."

In making the offer, Post recognized that the final arrangements would be subject to the approval of the attorney general "and if necessary a court of competent jurisdiction."

Midkiff accepted the offer on behalf of the estate on June 28, 1968. He did so over the objection of the minority trustee, but with the consent of the other trustees. The acceptance of the offer was approved by the attorney general. The matter was not submitted to the circuit court for approval.

Subsequent to the acceptance of the offer, Post and

---

[9]Phase I involved construction of all roads and utilities necessary to serve the areas north of Keauhou Bay, the area at the bay, and Area 15 south of the bay, as shown on the plan prepared by Community Planning Consultants.

the majority trustees executed the following documents:[10] Implementation Draft No. 1, dated July 1, 1968; Implementation Draft No. 2, dated August 20, 1968; and Implementation Draft No. 3, dated December 19, 1968.[11] Implementation Draft No. 3 was also executed by KDC.

As in the case of the acceptance of the offer, the execution of the implementation drafts by the majority trustees was over the objection of the minority trustee, had the approval of the attorney general, but was without the approval of the circuit court.

Implementation Draft No. 1 merely implemented the provisions of the offer which were stated broadly therein, one of the implemented matters being the designation of KDC as the joint developer with Post. But Implementation Draft No. 2 and Implementation Draft No. 3 made material changes in the offer.

The offer, the implementation drafts, and all actions taken thereunder were superseded by the following two agreements: (1) an agreement executed by the majority trustees and Post, which will hereafter be referred to as the Bishop-Post agreement, and (2) an agreement executed by KDC and Post, which will hereafter be referred to as the KDC-Post agreement. Consequently, we will not enter into a discussion of the contents of the implementation drafts in any detail.

However, a knowledge of certain actions taken by the majority trustees, Post, and KDC under the offer and the implementation drafts, before the execution of the Bishop-Post agreement and the KDC-Post agreement, is necessary to an understanding of those agreements. So,

---

[10]Ching was appointed as trustee on August 30, 1968, after the acceptance of the offer and the execution of Implementation Draft No. 1 and Implementation Draft No. 2. He signed Implementation Draft No. 3. That action constitutes concurrence by him in the execution of the prior documents.

[11]In connection with Implementation Draft No. 3, Post and the majority trustees executed a separate agreement, covering the following matters: (1) terms of sale of the estate lands agreed to be sold to Post in that draft; and (2) Post's commitment to lease certain hotel sites in the makai area from the trustees. The separate agreement will be treated in this opinion as a part of Implementation Draft No. 3.

we will address ourselves to a brief discussion of those actions.

From July 1, 1968, to the time of the execution of the Bishop-Post agreement and the KDC-Post agreement, KDC and Post engaged in the joint development of the makai area, under the name of Keauhou-Kona Company, on the assumption that a joint venture agreement between them would be eventually executed. The funds required for the work were obtained from the First Hawaiian Bank through a loan of $1,650,000 negotiated by Post upon his credit. The work was directed by an agency committee of four members, of whom two were appointed by KDC and two were appointed by Post.

Also, in accordance with the offer, two appraisers were appointed, Philip Won by Post and John Child, Jr., by the trustees. The appraisers were directed to appraise the lands at their fair market value as of July 1, 1968.

Won appraised the lands at $10,435,000. Child's appraisal was $14,969,000. Thus, the two appraisers differed by more than 10 percent. In fact, Child's appraisal exceeded Won's appraisal by more than 43 percent. But a third appraiser was not appointed. This was because the trustees and Post were unable to agree upon the third appraiser.

At that juncture, it was noted that, according to the report of the trustees' financial consultant, the difference in the appraisals was accounted for by the difference in the values placed on the hotel sites, and the appraisals were close if the hotel sites were eliminated.

The hotel sites comprise approximately 95 acres in the makai area. Won appraised the lands, exclusive of the hotel sites, at $7,500,000. Child appraised the same at $8,250,000. Won's appraisal of the mauka area was $4,200,000. Child's appraisal of the same was $4,415,000.

In view of the facts stated above, the majority trustees and Post agreed:

(1) that the hotel sites would be retained by the

trustees as estate land, leaving the makai area exclusive of the hotel sites (hereafter referred to as the balance of the makai area) and the entire mauka area to be developed by KDC and Post as joint venture lands;

(2) that the joint venture lands would be valued at $8,000,000, with the value of $4,500,000 assigned to the mauka area and the value of $3,500,000 assigned to the balance of the makai area.

(3) that Post would purchase the mauka area from the trustees and contribute the same to the joint venture, paying therefor $1,250,000 down and the balance by promissory note payable in 15 years, with security and interest on the terms substantially similar to those previously stated;

(4) that KDC would obtain the balance of the makai area from the trustees and contribute the same to the joint venture, plus $1,000,000 in cash;

(5) that the cost of all improvements constructed in the makai area before July 1, 1968, and reflected in the appraisal reports would be the sole responsibility of KDC;

(6) that the trustees would reimburse the joint venture 75 percent of the cost of improvements constructed in the makai area after July 1, 1968, as the cost of improvements allocable to the hotel sites; and

(7) that Post would lease certain hotel sites in the makai area from the trustees on the terms and conditions stated in the form of lease previously delivered by the trustees to Post.

The foregoing agreement was incorporated in Implementation Draft No. 3, which also provided: "This agreement is intended to amend, supplement and clarify all previously existing agreements between and among parties. It is not intended to supersede them except insofar

as is expressly provided herein and except as so provided, all prior agreements between and among the parties are hereby reaffirmed."

Post deemed the execution of Implementation Draft No. 3 as completing the "final arrangements" mentioned in his offer. On December 30, 1968, he paid $780,000 to the estate as prepaid interest for three years on the deferred balance of the purchase price of the mauka area. Thereafter, he offered to pay the down payment of $1,250,000 for the area, and requested the majority trustees to deliver the agreed limited warranty deed to him.

The majority trustees withheld performance. After the execution of Implementation Draft No. 3, they began to entertain serious reservations about the agreement consummated thereby. Consequently, they sought the advice of the regular counsel for the estate. Previously they were represented by special counsel in their dealings with Post.[12]

The regular counsel advised the majority trustees to endeavor to iron out matters in controversy with Post, prepare a complete redraft of the agreement to supersede the earlier documents, and submit the new agreement to the circuit court for approval; and, in the event of failure to reach an agreement, to institute a proceeding in the circuit court for a declaratory judgment to determine: (1) whether a binding contract existed between Post and the estate, and (2) the propriety of the trustees entering into the transaction with Post.

The majority trustees had their special counsel prepare a motion for the purpose stated in the general counsel's opinion. But they did not file the motion in court. Instead, they entered into further negotiations with Post, which resulted in the execution of the Bishop-Post agreement and the KDC-Post agreement. The two agreements were subject to the approval of the attorney general. They

---

[12]The regular counsel was J. Garner Anthony; special counsel were Norman K. Chung and Frank D. Gibson, Jr.

were not made subject to the approval of the circuit court.

The Bishop-Post agreement is embodied in the documents referred to in the minority trustee's motion and the circuit court order appealed from as Exhibits A, B, and C. The KDC-Post agreement is embodied in the documents referred to in the same motion and order as Exhibits D, E, and F. Exhibits A and D are the basic documents in the two agreements. They were executed on December 29, 1969, to be retroactively effective as of July 1, 1968. Exhibits B and C amended Exhibit A. Exhibits E and F amended Exhibit D. All of the documents were executed, insofar as the majority trustees and KDC were concerned, over the objection of the minority trustee.

The Bishop-Post agreement provided for an outright sale of the mauka area by the trustees to Post for $4,500,000. It contained the following further provisions regarding the details of the sale:

(1) that the conveyance would be made to Kona-Post Corporation, a Hawaii corporation;

(2) that the price would be paid $1,250,000 in cash upon the delivery of the trustees' customary limited warranty deed and $3,250,000 by a promissory note executed by Post simultaneously with the delivery of the deed but to be dated December 28, 1968;

(3) that the principal of the note would be paid in 10 annual installments of $325,000 each, commencing December 30, 1972;

(4) that the note would bear interest at the rate of 8 percent per year for the first 3 years, and thereafter at the rate of 1-½ percent above the New York prime rate in effect on each interest payment date;

(5) that the interest for the first 3 years having been

prepaid, subsequent interest would be paid annually, commencing December 30, 1972;

(6) that the payment of the note would be secured by (a) Post transferring to the trustees his interest in the funds payable to him under the KDC-Post agreement, and (b) Post causing all of the outstanding shares of Kona-Post Corporation to be pledged to the trustees;

(7) that, until Post should commit a default in any payment required under the note, all voting rights and other incidents of ownership of the pledged capital stock would remain in the owner of the stock;

(8) that Kona-Post Corporation would not be restricted in any way from using, developing, leasing, hypothecating, or selling portions of the conveyed land; and

(9) that Post would covenant, as the controlling stockholder of Kona-Post Corporation, "that there will be no dividends or distributions made out of Kona-Post Corporation for so long as the aforesaid capital stock is pledged to secure aforesaid note; that all proceeds from the use, development, lease, hypothecation or sale of all or any part of the aforesaid land will be used only in carrying out those business activities of said corporation which are directly related thereto; and that for so long as the aforesaid capital stock is pledged to secure the aforesaid note, there will be no sale, use, lease or hypothecation of any part of the aforesaid land which might reasonably result in any diminution in the aggregate fair market value of the assets of Kona-Post Corporation."

The KDC-Post agreement first provided for the dissolution of Keauhou-Kona Company as of the close of

business on December 31, 1969, with KDC taking over all of the assets and discharging all of the liabilities thereof as of that date. The dissolution was conditioned upon the delivery by the trustees of the deed to the mauka area mentioned in the Bishop-Post agreement.

That provision was followed by the following provisions, which were premised on the trustees conveying the makai area to KDC:

 (1) construction by Post of improvements in the makai area at KDC's expense in accordance with a plan prepared by R. M. Towill Corporation, with Post guaranteeing that certain phases of the work would be done within a maximum cost of $6,079,409;

 (2) construction by Post of an executive golf course and club house in the makai area, if requested by KDC, at a cost not exceeding $1,000,000 to be paid by KDC;

 (3) construction by Post of an 18-hole golf course in the mauka area at his expense "when permitted to do so by land use and zoning laws and ordinances," with first preference in the use of the course to be given to guests of the hotels constructed in the makai area;

 (4) formation of a corporation for joint operation of the existing golf course in the makai area, the proposed executive golf course, and the golf course to be constructed in the mauka area;

 (5) rendition by Post of certain managerial services in the makai area for KDC, for which KDC would pay to Post $236,000 per year from January 1, 1970, to December 31, 1974, and $118,000 per year from January 1, 1975, to December 31, 1979, with provision for making such payments only out of 50 percent of KDC's rental income from the makai area and provision for making

adjustments in the amounts of payments in accordance with changes in the United States Wholesale Commodity Price Index;

(6) rendition by Post of leasing services, if requested by KDC, for which KDC would pay to Post a fee amounting to 4 percent of the rental received under each lease negotiated by him, for a period of 15 years commencing with the expiration of the development time allowed in the lease; and

(7) leasing by Post of two hotel sites from KDC and construction of hotels thereon according to stated time tables.

The agreement also provided that it did not constitute a personal service contract with Post individually; that Post would cause it to be performed by his agents, employees, independent contractors hired by him, or a corporation controlled by him; that Post was specifically authorized to assign it to a corporation controlled by him, subject to the condition that he would be personally liable for its performance notwithstanding its assignment; and that in the event of Post's death, all of his rights and obligations thereunder would vest in the personal representative of his estate.

The attorney general approved the Bishop-Post agreement and the KDC-Post agreement on March 16, 1970. Four days later, the minority trustee filed his motion in this case.

In the motion, the minority trustee sought a judicial determination of the following questions:

(1) whether the agreements contravened the November 19, 1965, judgment;

(2) whether the agreements were within the authority of the trustees and KDC, expressed or implied in the judgment, with respect to the land development authorized therein, and

(3) whether the agreements were neither contrary to the best interests of the estate and KDC nor outside the bounds of reasonable judgment of the trustees.

The majority trustees and the attorney general opposed the motion. The former urged denial of the motion on two grounds: (1) that the minority trustee had no standing to be heard thereon, and (2) that KDC, Post, and Kona-Post Corporation were not joined as parties in the proceeding, although they were indispensable parties in that their rights would have been adversely affected by a decision in favor of the minority trustee on the motion. The latter contended that the motion should be denied solely on the ground that the minority trustee had no standing to be heard.

The court rejected the contentions in opposition to the motion, held extensive hearings on the substantive issues raised by the minority trustee, and filed a decision and order on May 1, 1970.

In the decision, the court was critical of the actions taken by the majority trustees, as well as of their failure to take certain actions, with respect to the Keauhou project and the agreements concluded with Post, and concluded that, insofar as those matters were concerned, they deviated from the judgment and not only abused their discretion but failed to exercise reasonable discretion.

At this point, we will not list the reasons given by the court for its conclusion. The reasons will be stated later when the points raised on these appeals are considered.

In the order, the court did the following:

(1) disapproved the Bishop-Post agreement; instructed the trustees that, in the circumstances under which the agreement was executed, they were without power under the will and the judg-

ment to effect the sale of the land referred to therein; and ordered them not to effect the sale;

(2) disapproved the KDC-Post agreement; instructed the trustees, as stockholders, directors, and officers of KDC, that, in the circumstances under which the agreement was executed, they were without power under the judgment to cause KDC to perform the agreement; and ordered them to cause KDC not to perform the agreement; and

(3) instructed the trustees, in their capacities as trustees and as owners of KDC, to report to the court concerning their plans for safeguarding the investment of the estate in the Keauhou project and the fulfillment of the obligations owed to lessees, contractors and others in connection with the project, within 14 days after the filing of the order.

The majority trustees filed their report in compliance with paragraph 3 of the order within the time mentioned therein, together with requests for approval of certain actions which they deemed necessary in the interest of the estate. The minority trustee filed his own report.

On May 27, 1970, the court entered an order accepting the majority trustees' report and authorizing the trustees:

(1) to cause the dissolution of Keauhou-Kona Company, as of December 31, 1969, with KDC receiving all of the assets and assuming all of the obligations thereof as of that date, such obligations being in the sum of $1,734,195;

(2) to repay to Post, on or before June 30, 1970, the sum of $780,000, with interest thereon at the rate of 8 percent per year from January 1, 1969, said sum being the amount previously paid by him as prepaid interest on the promissory note described in Implementation Draft No. 3;

(3) to cause the work described in Exhibit A attached to the majority trustees' report to be done at an estimated cost of $396,645;

(4) to cause the work described in Exhibits B and C attached to the majority trustees' report to be done at an estimated cost of $1,900,359;

(5) to advance not more than $1,333,000 during the period May 1, 1970, to June 30, 1970, and the sum of not more than $3,867,000 during the period July 1, 1970, to June 30, 1971, for the performance of the work referred to in (3) and (4), for the payments required under (1) and (2), and for the payment of other costs in connection with the completion of Phase I of the Keauhou project, as set forth in Exhibit D attached to the majority trustees' report, such advances to be evidenced by demand promissory notes bearing interest at the rate of 1 percent per year above the New York prime rate;[13]

(6) to assume and continue the loan in the sum of $1,624,445, made by First Hawaiian Bank to Keauhou-Kona Company and to borrow from banks or institutional lenders additional sums up to $3,400,000 for the purpose of providing funds for the advances authorized in (5), subject to the loan agreement executed by the trustees with Prudential Insurance Company of America.[14]

The court predicated the foregoing order upon its finding that the statements in the majority trustees' report were true, that the requests made therein were rea-

---

[13]The order did not state the party to whom advances were to be made. It is obvious that KDC was the party.

[14]The loan agreement with Prudential Insurance Company of America provided: "The Estate covenants that it will not, without prior written consent, create, incur, assume or suffer to exist any funded or current debt, or guarantee, endorse or otherwise be or become contingently liable in connection with the obligations, stock or dividends of any person * * *."

sonable, and that prompt granting of the requests was necessary to enable the trustees to safeguard the investment of the estate in the Keauhou project and to enable them to fulfill the obligations incurred in connection therewith.

Following the entry of the order, the majority trustees filed a further report in which they stated that the mauka area would be managed by the estate staff and the makai area would be managed by KDC.

On June 16, 1970, the court entered its final order in the cause. The order consists of five paragraphs. The first four paragraphs directed the trustees to:

(1) arrange for, and fund, competent management of the Keauhou project until the project management and responsibilities are undertaken by some party other than the trustees or KDC;

(2) formulate and arrange for execution of a plan to obtain outside capital or repay the Keauhou-Kona Company obligations in the sum of $1,734,195, which were assumed by the trustees, and the costs of completion of Phase I of the Keauhou project, which were estimated at $2,297,000 and authorized to be constructed; promptly repay the Keauhou-Kona Company obligations and the additional loans obtained to pay the costs of completion of Phase I; and, if by June 30, 1971, such outside capital or long-term funds are not committed to be furnished by one or more responsible investors in the project, so that the estate can be reimbursed and the loans immediately repaid, then, promptly thereafter, either sell the project or affirmatively show that continued financing of the project by the estate can be accomplished without curtailment of or jeopardy to the operations of Kamehameha Schools and the carrying out of currently anticipated projects of the schools and the estate;

(3) obtain the approval of the court prior to the execution of the plan referred to above or to any transfer of fee simple title to any of the project lands and the balance of the mauka area, except that any transfer of title to governmental bodies and utilities shall not require prior court approval; and

(4) pay over to the minority trustee, out of the trust estate, for reimbursement to him and use by him for payment of fees and costs incurred but not yet paid, the sum of $35,809.50.

Paragraph 5 reiterated paragraphs 1 and 2 of the May 1, 1970, order, and paragraphs 1 through 6 of the May 27, 1970, order. Hereafter, the portion of paragraph 5, which reiterated paragraphs 1 and 2 of the May 1, 1970, order will be referred to as paragraphs 5 (1) and 5 (2).

The majority trustees appealed from paragraphs 1, 2, 3, (5) (1) and 5 (2) of the final order. The attorney general included paragraph 4 in his appeal. Otherwise his appeal is identical with that of the majority trustees.

On July 30, 1970, after the appeals had been taken to this court, the majority trustees and Post executed a supplemental agreement in which they agreed that the promissory note for $3,250,000 for the balance of the purchase price of the mauka area, which was originally agreed to be executed by Post, would be executed by Kona-Post Corporation, with Post unconditionally guaranteeing the payment of the same, and that Post would cause Kona-Post Corporation to execute a purchase money mortgage substantially in accordance with the draft of a mortgage attached thereto. Also, on the same day, KDC and Post executed a supplemental agreement which added to the provision for construction of a golf course in the mauka area by Post, when permitted to do so by land use and zoning laws and ordinances, the following sentence: "Post agrees to use his best efforts to obtain the requisite land use classification, zoning, or

permits to construct aforesaid second 18-hole golf course."

The supplemental agreements were executed because, among the reasons given by the circuit court for its disapproval of the Bishop-Post agreement and the KDC-Post agreement were the following: (a) the inadequacy of security for the payment of the balance of the purchase price of the mauka area, in that there was no requirement for execution of purchase money mortgage; and (b) the fact that no obligation was imposed upon Post to seek any land use or zoning change, although the proposed site for the second golf course was in an area zoned for agricultural uses and Post's qualified agreement to construct the golf course was an important consideration in arriving at the final agreements.

The attorney general approved the supplemental agreements on November 23, 1970. Thereafter the majority trustees filed a motion in the circuit court seeking an approval of the same, but, by an order entered on December 30, 1970, the court dismissed the motion on the ground that it was without jurisdiction to act thereon after the cause had been appealed to this court.

On March 15, 1971, after the filing of the opening briefs, but before the filing of the answering brief on the appeals, the majority trustees moved in this court for a remand of the cause to the circuit court to enable it to act on the supplemental agreements. The minority trustee countered with a motion to dismiss the appeals, on the ground that the supplemental agreements made the appeals moot, or, in the alternative, to deny remand. The majority trustees and the attorney general opposed dismissal of the appeals, contending that the appeals raised many issues not affected by the supplemental agreements and were not moot. This court denied dismissal and remand, and heard the appeals on their merits upon completion of the required briefing.[15]

---

[15]In Appeal of Frank Foundries Corporation, 323 Ill. App. 594, 56 N.E. 2d 649 (1944), it is stated that "if a substantial issue or question remains

Having stated the facts, we turn to the issues raised in these appeals, and will first consider the procedural issues relating to the minority trustee's standing to be heard and the absence of KDC, Post, and Kona-Post Corporation as parties in the proceeding.

In our opinion, the circuit court did not err in according to the minority trustee a standing to be heard.

The court based its ruling primarily upon its retained jurisdiction under the November 19, 1965, judgment, although it thought that the standing could also be premised upon the charges of threatened breaches of trust by the majority trustees contained in the minority trustee's statement of reasons for the motion.

The minority trustee was one of the plaintiffs in Civil No. 17913. In the judgment, the court retained jurisdiction of the cause "with leave to the parties to apply for other and further relief as may be appropriate and equitable in the premises."

We think that the word "parties", as used in the judgment, includes an individual trustee within its meaning. Such construction accords with the plain meaning of the word.

The majority trustees urge that, within the context of the judgment, that word has reference to all of the trustees collectively, or a majority of the trustees, because all actions affecting the estate must be taken by at least a majority of the trustees.

We reject such construction as being overly restrictive and not in the interest of the estate. In case of any threatened deviation from the judgment by a majority of the trustees, a minority trustee will be in the best position to bring the matter to the attention of the court for appropriate action. *Cf. Holt* v. *College of Osteopathic Physicians and Surgeons,* 61 Cal. 2d 750, 394 P.2d 932, 40 Cal. Reptr. 244 (1964) .

---

in the case, the cause is not moot." A similar statement is found in Reserve Life Insurance Co. v. Frankfather, 123 Colo. 77, 225 P.2d 1035 (1950) .

We are also of the opinion that the circuit court did not err in hearing the minority trustee's motion in the absence of KDC, Post, and Kona-Post Corporation as parties in the proceeding.

The basic question for decision raised in the minority trustee's motion was whether the majority trustees exceeded their authority under the will of Bernice Pauahi Bishop and under the November 19, 1965, judgment in executing the Bishop-Post agreement and in causing the execution of the KDC-Post agreement.

All of the parties necessary for the decision of that question were before the circuit court. The presence of KDC, Post, and Kona-Post Corporation as parties was not necessary for the decision. If the majority trustees required the assistance of KDC, Post, and Kona-Post Corporation to support their position, they received such assistance. Robert Chatterton, chairman of the board of directors of KDC, testified as their witness. So did Howard Marsh, Post's principal representative in Hawaii and president of Kona-Post Corporation.

We do not think that the situation in this case was any different from the situation in cases under the Sherman Act, National Labor Relations Act, and Federal Trade Commission Act, where orders were entered without the presence of the persons affected thereby as parties in the proceedings.

On this point, *National Licorice Co.* v. *National Labor Relations Board,* 309 U.S. 350 (1940) , is apposite. The question for decision there was whether the board had authority to order an employer not to enforce the contracts with its employees, which had been found to be in violation of the National Labor Relations Act, in the absence of the employees as parties before the board. In affirming the order of the board, the United States Supreme Court stated that the order did "not go beyond those in suits brought by the United States to restrain violations of the Sherman Act, where the injunction was

broad enough to prevent the offender from carrying out contracts with persons not parties to the suits," and also stated that "in proceedings before the Federal Trade Commission, the order restraining unfair methods of competition may preclude the performance of outstanding contracts by the offender." (309 U.S. 365, 366).

Furthermore, in the posture of the case at this time, we do not think that the order appealed from should be reversed, even if the ruling of the circuit court on the issue of indispensable parties were erroneous. The substantive issues in these appeals are too important to be sidestepped on technical considerations regarding indispensable parties. The rule regarding indispensable parties is founded on equitable considerations, and is not jurisdictional. 3A Moore's Federal Practice § 19.19 (2d ed. 1967).

In the advisory committee notes to the 1966 amendment of Rule 19 of the Federal Rules of Civil Procedure, it is stated:

> "Even if the court is mistaken in its decision to proceed in the absence of an interested person, it does not by that token deprive itself of the power to adjudicate as between the parties already before it through proper service of process. * * * It is true that an adjudication between the parties before the court may on occasion adversely affect the absent person as a practical matter, or leave a party exposed to a later inconsistent recovery by the absent person. These are factors which should be considered in deciding whether the action should proceed, or should rather be dismissed; but they do not themselves negate the court's power to adjudicate as between the parties who have been joined." 3A Moore's Federal Practice § 19.01 [5.-11] (2d ed. 1967).

With the procedural issues out of the way, we will now consider the substantive issues. The principal sub-

stantive issues are: (1) whether the circuit court erred in disapproving the Bishop-Post agreement and ordering the trustees not to effect the sale of the land mentioned therein; and (2) whether the court erred in disapproving the KDC-Post agreement and ordering the trustees to cause KDC not to perform the same. Those issues are raised in the appeals from paragraphs 5 (1) and 5 (2) of the final order.

The majority trustees and the attorney general urge upon us that the circuit court erred in its actions with respect to the two agreements, contending: (1) that the Bishop-Post agreement represents a reasoned exercise by the majority trustees of the trustees' authority to sell estate lands under the will; (2) that the KDC-Post agreement likewise represents a proper exercise by the directors of KDC of KDC's authority to engage in the business of developing lands; and (3) that both agreements were approved by the attorney general and reflect his studied opinion. We see no merit in any of the contentions.

With regard to the contention relating to the Bishop-Post agreement, the record shows that the agreement was executed, as a part of a package with the KDC-Post agreement, to replace the agreement under Post's offer of June 18, 1968, which was finalized with the execution of Implementation Draft No. 3.

The agreement under Post's offer of June 18, 1968, as so finalized, will hereafter be referred to as the original agreement. That agreement was a tripartite agreement inasmuch as Implementation Draft No. 3 was signed not only by the majority trustees and Post but also by KDC.

The record also shows that, in agreeing to the price and other terms of the Bishop-Post agreement, the majority trustees (1) weighed the benefits which were likely to accrue eventually to the estate from the KDC-Post agreement, and (2) took into consideration their commitments to Post in the original agreement, which they deemed to be binding on the estate.

In our opinion, the Bishop-Post agreement must stand on its own merits, independently of the KDC-Post agreement and without regard to any consideration based on the majority trustees' prior dealings with Post.

The Bishop-Post agreement must be capable of withstanding scrutiny independently of the KDC-Post agreement because the obligation of the trustees to make the conveyance thereunder is not conditioned on the performance of Post's obligations in the KDC-Post agreement. Some aspects of the KDC-Post agreement are contingent upon the performance of the Bishop-Post agreement. But the opposite is not true. The Bishop-Post agreement calls for a conveyance to Kona-Post Corporation. But Kona-Post Corporation has no responsibility with respect to the KDC-Post agreement. If the Bishop-Post agreement is valid and Kona-Post Corporation meets all of the requirements which entitle it to the conveyance, the trustees may not refuse to convey on the ground that the KDC-Post agreement has not been performed.

Likewise, the Bishop-Post agreement must be capable of being sustained as a prudent trustee action under the will without regard to the original agreement or anything which previously transpired between the majority trustees and Post, for the reason that the original agreement had no binding effect on the estate without the approval of the circuit court.

As stated earlier in this opinion, the majority trustees had their special counsel prepare a motion for the purpose of obtaining an adjudication on the validity of the original agreement, but did not file the same in court. The evidence in the case is that the motion was not filed because Post objected to the filing, despite his recognition in the offer of June 18, 1968, that the final arrangements thereunder would be subject to the approval of the attorney general "and if necessary a court of competent jurisdiction."

The submission of the original agreement to the cir-

cuit court was necessary for several reasons, among which was the fact that the land development which KDC undertook thereunder clearly deviated from the judgment.

Under the agreement, KDC undertook to develop the entire mauka area of approximately 1,800 acres and the makai area of approximately 550 acres on an equal joint venture basis with Post.

There is some question whether the judgment authorizes KDC to participate in any joint development of lands. Strictly construed, the judgment appears to authorize KDC to develop only on its own account and not as a joint developer. Be that as it may, there is no question that, insofar as the extent of the development is concerned, the judgment confines KDC's activity to the project lands described in the complaint in Civil No. 17913, consisting of the makai area and approximately 550 acres of the mauka area.

KDC is a corporation formed under paragraph 1 of the judgment. The circuit court order of April 4, 1966, subjected it to all of the terms and conditions of the judgment, other than the condition relating to the obtaining of a ruling of the Internal Revenue Service.

The measure of the authority of a corporation formed under paragraph 1 of the judgment is to be sought in the judgment, not in the broad catch-all provisions of the articles of association.

Paragraph 2 of the judgment provides: "The corporation when formed will engage in the business of development, subdivision, sale, leasing of the real property conveyed to it and in general will have authority to do all things relating to the development of said lands which are customarily done by similar business corporations and will be fully taxable under state and federal laws.

In the context of the judgment, the words "the real property conveyed to it" and "said lands", in the pro-

vision quoted above, refer to the lands which the trustees are authorized to convey under paragraph 1. The lands which the trustees are so authorized to convey are the project lands. (See footnote 3.)

For any development of other estate lands, paragraph 8 of the judgment provides for the formation of other corporations, subject to review by the attorney general and approval by the court before their formation.

Thus, the development of the portion of the mauka area outside of the boundaries of the project lands is not within KDC's authority under the judgment. The participation of KDC in the development of that portion of the mauka area would have required an amendment to the judgment.

Another reason for requiring the submission of the original agreement to the circuit court was the fact that the action of the majority trustees in joining in an agreement which made KDC an equal participant with Post in the joint development of the entire mauka area posed a very serious question as to whether they acted prudently and in the best interest of the estate in taking such action.

Post's representatives estimated the cost of development of the mauka area at $50,000,000. Keppeler deemed such estimate to be realistic. Ching's testimony also brought the cost of development of the total acreage in the mauka area within the range of that estimate.

As a developer on an equal joint venture basis with Post, KDC would have been required to provide one-half of the development cost. The record shows that Post desired to undertake the development as rapidly as possible. But KDC had no independent financial resource to provide its share of the cost.

In the circumstance, the burden of providing KDC's share of the development cost would necessarily have fallen on the estate. The estate had no obligation under

the agreement to advance such cost. But, in order to protect its investment in KDC, the estate would have had no other choice.

The rendering of such assistance to KDC would have severely curtailed the liquid financial resources available for the use of the Kamehameha Schools. Additionally, it would have posed a possibility that the estate itself would be treated as a joint developer, a position which the trustees were previously cautioned by their regular counsel not to get the estate into because of the tax problems which might arise incident to such involvement.

A further reason which required the submission of the original agreement to the circuit court was that the action of the majority trustees in agreeing to the formula of allocation of the improvement cost of the makai area was also questionable as a prudent trustee action.

In the agreement the majority trustees committed the estate to reimburse the joint venture 75 percent of the improvement cost of the makai area after July 1, 1968, as the cost of improvements allocable to the hotel sites. The commitment was without a ceiling.

Post's representatives estimated such improvement cost to be between $12,000,000 and $14,000,000. The engineer for the estate originally estimated such cost to be approximately $5,500,000, and later stated that the figure might be subject to an adjustment of about 10 percent for increase in material and labor costs after the original estimate.

In the face of such wide discrepancy in figures, it would appear that the commitment of the estate to an open-ended liability was not an act of prudence.

The reasons discussed above for the submission of the original agreement to the circuit court is not exhaustive by any means. However, they are sufficient to show the necessity of submission.

We now come to the question: Can the Bishop-Post

agreement stand on its own merits? The answer to that question depends on whether the majority trustees exercised reasonable judgment on two points. One point is whether the sale was necessary for the capital or operational requirements of the Kamehameha Schools or was otherwise for the best interest of the estate. The other point relates to the price at which the lands were agreed to be sold.

The 17th paragraph of the first codicil to the will of Bernice Pauahi Bishop grants to the trustees "the most ample power to sell" estate lands, but also contains a direction to them not to sell any land "unless in their opinion a sale may be necessary for the establishment or maintenance of said schools or for the best interest of my estate."

In *Hyde* v. *Smith*, 11 Haw. 535, 538 (1898), this court affirmed an equity court decree which held that the trustees acting under the testamentary provision mentioned above "are vested with a discretion to act in regard to the sale and disposal of land, devised or conveyed to them whenever it appears to them expedient and for the best interest of the estate; that they are under no obligation to apply to a court of equity so to do; and that a court of equity should not intervene unless it is made to appear that the trustees are abusing the discretionary powers vested in them."

The record in the case does not show that the majority trustees executed the Bishop-Post agreement upon a determination that the sale mentioned therein was necessary for the capital or operational requirements of the Kamehameha Schools or was for the best interest of the estate otherwise than as a means to free the estate from the original agreement. The evidence is that the Bishop-Post agreement resulted from the following: (1) the desire of the majority trustees not to go through with the original agreement; (2) the failure of the majority trustees to obtain Post's acceptance of any of the alternatives

proposed· by them, including the concept of a master
development lease; (3) the refusal of Post to enter into
any discussion looking to his withdrawal from the original
agreement; and (4) the determination of the majority
trustees that, in the circumstance, the Bishop-Post agree-
ment and the KDC-Post agreement, taken together, were
"so much better" than the original agreement, which
was deemed by them to be binding on the estate.[16]

It appears from the record that the majority trustees'
desire not to go through with the original agreement was
based upon their realization, after the execution of Im-
plementation Draft No. 3, that the participation of KDC
in the joint development of the mauka area with Post
could involve a considerable financial burden on the
estate and that the provision therein regarding the estate's
liability for the share of the improvement cost of the
makai area was too open-ended.

Those reasons are the very reasons which we have
stated for requiring the submission of the original agree-
ment to the circuit court.

A determination that an agreement is better than the
agreement previously executed, with no binding force
on the estate and as to which the majority trustees enter-
tained enough reservation to form a desire not to go

---

[16]Among the documents in evidence is the minutes of the trustees meeting
held on December 11, 1969, to which Robert Chatterton and James Evans,
two KDC directors who were not trustees of the estate, were invited. The
meeting was called for the purpose of discussing the drafts of the Bishop-Post
agreement and the KDC-Post agreement. At the meeting, Chatterton made the
observation that Post was buying the mauka lands "at such favorable price,"
and stated: "I don't want to be so presumptuous as to interject my judgment
into a matter that is purely within the prerogative of the trustees, but it's
awfully difficult in the position of KDC, to divorce the position of the
Trustees from the position of KDC. If I might be bold enough to ask ques-
tions — as I say, it might not be within my province — is the relationship
with Troy Post so far down the road that it is irrevocably committed to put
together some form of relationship with him?" To this, Keppeler replied:
"May I try to answer that — we have a valid Implementation No. 3 that
exists. There, I think if these revised arrangements should fall apart, Post
can force our performance under Implementation 3. This is so much better,
although there are weak spots * * * ."

through with it, is not a determination that the sale mentioned therein is for the best interest of the estate.

There is nothing in the record to indicate that the majority trustees deemed that an outright sale of the mauka area to Post was in the interest of the estate, except as a means to resolve the problem with respect to the original agreement. There is an indication in the proposal made by the majority trustees for a master development lease as a substitute for the original agreement that they deemed the best interest of the estate required that they do not relinquish complete control of the mauka area to the end that the estate may benefit from a future appreciation of the area.

On the point regarding the price of the lands, here also the record does not show that the trustees made the required determination. Because the Bishop-Post agreement must stand independently of the KDC-Post agreement and without regard to the majority trustees' prior dealings with Post, the price must be the fair market value of the lands at the time the agreement was negotiated. The trustees made no determination of the value of the lands as of such time.

The Bishop-Post agreement is dated December 29, 1969, but requires the conveyance to be made as of July 1, 1968. The price stated therein is based on the appraisals of the mauka area made by Won and Child as of the earlier date in connection with Post's offer of June 18, 1968.

The majority trustees do not contend that the price of the lands remained constant from July 1, 1968, to the time the Bishop-Post agreement was negotiated. Their position is that the trustees could not have changed the valuation date inasmuch as the Bishop-Post agreement is a renegotiation of the original agreement which was binding on the estate and on which the trustees were in default in failing to tender the deed called for therein. That position is not tenable. The original agreement did

not bind the estate, and the trustees were not in default thereunder.

We hold that the Bishop-Post agreement cannot stand on its merits, and is, therefore, invalid.

The circuit court gave three reasons for disapproving the Bishop-Post agreement. The first, and principal, reason was identical with ours, namely, that the use of the July 1, 1968, valuation as the selling price of the lands was improper. The second reason was that, even if the use of the July 1, 1968, valuation were proper, the majority trustees improperly based the selling price on the appraisals of Won and Child, for those appraisals were not reasonably close to the market value as of that time established by other evidence in the case. The third reason was that the provision in the agreement to secure the payment of the unpaid balance of the purchase price was inadequate in that it did not require the execution of a purchase money mortgage on the conveyed lands.

The majority trustees and the attorney general strongly urge upon this court that the circuit court erred in the position it took with regard to the appraisals of Won and Child and the security provision in the agreement.

We need not rule on those matters in view of our holding that the Bishop-Post agreement is invalid because of the failure of the majority trustees to make the required determinations before executing the same.

However, we may state with regard to the security provision that the matter is moot. The matter was rendered moot by the supplemental agreement in which Post undertook to cause Kona-Post Corporation to execute a purchase money mortgage.

With regard to the appraisals of Won and Child, although any statement we make here on the matter will be dictum, we think that a brief discussion by this court is in order, inasmuch as our silence in the face of the statements of the circuit court may put the trustees in a quandary.

In setting forth its second reason for disapproving the Bishop-Post agreement, the circuit court was strongly critical of the procedure followed by Won and Child in arriving at their appraisals.

We think that the manner in which appraisers arrive at their appraisals is a matter of professional technique basically within the competence of the appraisers.

In this case, the professional competence of Won and Child are unquestioned. However, Won and Child were not employed to appraise the fair market value of the mauka area as of the time the Bishop-Post agreement was negotiated. Their commissions were to appraise both the mauka area and the makai area as of July 1, 1968, under certain assumptions, one of which was that the two areas be deemed to be under a single ownership.

If, in setting the price in the Bishop-Post agreement, the majority trustees desired to avail themselves of the expertise of Won and Child and the appraisal work already done by them, they should have asked them to update their appraisals as to the mauka area, and, additionally, inquired of them whether the severance of the ownership of the two areas would have made any difference in the results.

We think that the majority trustees would be deemed to have exercised reasonable judgment, and their action would not have been amenable to subsequent impeachment, if they had done the things mentioned in the preceding paragraph and had determined the price upon a critical review of the updated appraisals which were not subject to any limitations which might have affected the original appraisals.

With regard to the contention of the majority trustees and the attorney general that the KDC-Post agreement represents a proper exercise by the directors of KDC of KDC's authority to engage in the business of developing lands, the record shows that the agreement was negotiated by the majority trustees with Post as part of a package

with the Bishop-Post agreement; that Chatterton and Evans, two KDC directors who were not trustees, were briefed regarding the same; and that the agreement was executed on behalf of KDC by Keppeler and Ching, who, besides being officers and directors of KDC, were two of the majority trustees. The record is silent as to whether the directors of KDC acted on the agreement as a collective body at a director's meeting. However, the silence of the record in that regard is immaterial. Inasmuch as the Bishop-Post agreement and the KDC-Post agreement were negotiated as a single package, our holding on the former has sealed the fate of the latter. The record shows that Post's undertaking in the KDC-Post agreement to construct a second golf course in the mauka area was a substantial consideration in the consummation of that agreement insofar as KDC was concerned. Without the Bishop-Post agreement, Post cannot perform that undertaking; and, without the second golf course, the remainder of the KDC-Post agreement differs in material respect from the agreement that was negotiated.

Thus, the circuit court did not err in disapproving the KDC-Post agreement and ordering the trustees to cause KDC not to perform that agreement.

Turning to the contention of the majority trustees and the attorney general attributing validity to the Bishop-Post agreement and the KDC-Post agreement, as well as the original agreement, by reason of the approval of those agreements by the attorney general, we think that the contention is without merit because the attorney general has no authority to sanction any trustee action which deviates from the applicable trust provisions.

The function of the attorney general, as *parens patriae* of charitable trusts, is to oversee the activities of the trustees to the end that the trust is performed and maintained in accordance with the provisions of the trust document, and to bring any abuse or deviation on the part of the trustees to the attention of the court for correction. *Hite*

v. *Queen's Hospital,* 36 Haw. 250, 262 (1942). The authority of the attorney general over charitable trusts does not extend beyond the performance of that function. M. R. Fremont-Smith, *Foundations and Government,* 198 (1965). If a deviation from any trust provision is necessary in the interest of the trust, the power to authorize the deviation rests solely with the court. *Hawaiian Trust Co. v. Gonser,* 40 Haw. 245, 251 (1951); *Hawaiian Trust Co. v. Breault,* 42 Haw. 268, 271 (1958).

This completes our consideration of the appeals from paragraphs 5(1) and 5(2) of the final order, and brings us to the appeals from paragraphs 1, 2, 3, and 4.

There is no existing controversy on paragraph 1. That paragraph is concerned with interim management of the Keauhou project. According to the report filed by the majority trustees in the circuit court, such management function is presently performed by KDC with respect to the makai area and by the estate staff with respect to the mauka area.

The majority trustees attack paragraphs 2 and 3 as constituting an imposition of the judgment of the court over the judgment of the trustees on matters which are primarily within the competence of the latter and an unwarranted rejection by the court of "a well-considered plan of the trustees for selling unproductive lands and investing the proceeds thereof in capital investments for the Kamehameha Schools and for the development of land which will yield higher income."

The attorney general charges that the circuit court applied excessive remedy in paragraphs 2 and 3, and that, in framing those paragraphs, it took a negative approach and made no attempt to save the Keauhou project by viewing it impartially and leaving "the door open for modifications and clarifications which it might find acceptable."

The contentions of the majority trustees and the attorney general are not well taken.

In directing the trustees in paragraph 2 to formulate and arrange for execution a plan to obtain outside capital to reimburse the estate for all advances made in the Keauhou project, the circuit court did no more than to require the trustees to revert to their original concept. The original concept was that the trustees would convey the project lands to a development corporation and the corporation would develop the lands with funds obtained primarily from sources other than the estate.[17]

Also, in directing the trustees to sell the Keauhou project upon their failure to formulate a plan to obtain outside capital and arrange for its execution by June 30, 1971, the circuit court, in essence, did no more than to require the trustees to do that which they proposed to do in their letter of May 28, 1968, to the attorney general. In that letter, the trustees stated that they would sell the project if they failed to obtain a firm commitment from a third party by October 1, 1968, to invest not less than $4,500,000 in the project.

Further, it is to be noted that the direction to the trustees to sell the project upon their failure to obtain outside capital by June 30, 1971, was not an absolute one. The paragraph gave the trustees an opportunity to save the project, even upon such failure, by showing to the court that "continued financing of the project by the estate can be accomplished without curtailment or jeo-

---

[17]It is clear from the record that the trustees contemplated the development of the project lands with funds from two sources: (1) proceeds of sales of 20 percent or more of the capital stock of the corporation; and (2) loans negotiated by the corporation with lenders other than the trustees by mortgaging the project lands. Among the reasons given by the trustees for the development of the project lands through a corporation was that they had no authority under the will to borrow the funds required for land development but a corporation would have such authority. The November 19, 1965, judgment authorized the trustees to lend funds to the corporation formed thereunder. However, there is some question whether the authorization covers lending of estate funds for land development on a long-term basis. The findings of fact state that the lending by the trustees to the corporation is "to furnish capital necessary for its operation." The conclusion of law also states that the trustees may lend funds to the corporation "for its operation." Quaere, is the meaning of the word "operation" in the context of the findings of fact and conclusion of law broad enough to encompass land development?

pardy to the operations of Kamehameha Schools and the carrying out of currently anticipated projects of the schools and the estate."

Thus, the circuit court took an eminently reasonable approach in paragraph 2. The paragraph reflects due regard on the part of the court for the authority of the trustees, and its willingness to permit the trustees to save the Keauhou project upon a satisfactory showing that such course will be in the best interest of the estate.

However, paragraph 2 cannot be carried out at this time in its existing form. The June 30, 1971, date must be changed to some appropriate future date. Also, during the pendency of these proceedings, changes in situation might have occurred which render a review of the paragraph advisable. Consequently, we will remand this case to the circuit court for further consideration of the matters covered in paragraph 2 and appropriate action thereon in the light of the situation existing at the present time.

We see no error in paragraph 3. The requirement of court approval in that paragraph applies only to the execution of the trustees' plan to obtain outside capital for the Keauhou project formulated pursuant to paragraph 2, and to the transfer of fee simple title to the project lands and the balance of the mauka area. The present controversy was caused by the unauthorized actions of the majority trustees with respect to the Keauhou project, the project lands, and the balance of the mauka area. Thus, it is entirely proper for the circuit court to require its approval for trustee actions on those matters.

With respect to paragraph 4, it is well settled in this jurisdiction that attorney's fees and expenses incurred in a trust litigation is properly payable out of estate funds where the litigation is for the benefit of the estate. *Estate of Lalakea,* 26 Haw. 243, 275 (1922) ; *Estate of Afong,* 26 Haw. 337, 347 (1922) ; *Estate of Campbell,* 46 Haw. 475,

522, 382 P. 2d 920, 952 (1963.) There is no question that this proceeding inured to the benefit of the estate.

The final order is affirmed with respect to paragraphs 1, 3, 4, 5 (1) and 5 (2) , and remanded to the circuit court with respect to paragraph 2 for further proceeding in accordance with this opinion.

*Norman K. Chung (Frank D. Gibson* and *Ken Harimoto* with him on the briefs, *Conroy, Hamilton, Gibson, Nickelsen* and *Rush* of counsel) for appellants majority trustees.

*Arthur S. K. Fong,* Special Deputy Attorney General (*Shirley Smith,* Deputy Attorney General, with him on the briefs) for appellant State of Hawaii.

*Clinton R. Ashford (Ashford & Wriston* of counsel) for appellee Atherton Richards.

---

CONCURRING AND DISSENTING OPINION OF ABE, J.

I concur with the decision of the majority of this court on all of the issues decided, except on its holding that the Bishop-Post agreement is invalid. On this issue I respectfully dissent.

This court says that "[t]he record in the case does not show that the majority trustees executed the Bishop-Post agreement upon a determination that the sale mentioned therein was necessary for the capital or operational requirements of the Kamehameha Schools or was for the best interest of the estate otherwise than as a means to free the estate from the original agreement" and intimates that the agreement was entered into because the majority trustees determined that "the Bishop-Post agreement and the KDC-Post agreement, taken together, were 'so much better' than the original agreement, which was deemed by them to be binding on the estate."

It should be noted, however, that this court fails

to explain why the trustees had entered into the original agreement with Post on July 1, 1968.

Under the will of Bernice Pauahi Bishop, the trustees have wide discretion[1] to sell and convey real property, which comprises a substantial portion of the trust corpus. In *Hyde* v. *Smith,* 11 Haw. 535, 538 (1898), this court held that under the will the trustees could dispose of land "whenever it appears to them expedient and for the best interest of the estate; and they are under no obligation to apply to a court of equity so to do; and that a court of equity shall not intervene unless it is made to appear that the trustees are abusing the discretionary powers vested in them."

This is sound law[2] and I believe this court has no intention of overruling *Hyde* v. *Smith.*

I also believe that the record of this case clearly shows that the trustees have been plagued by the necessity of generating additional income for the maintenance of the Kamehameha Schools, and this factor compelled the trustees to undertake the Keauhou development. Also, Judge

---

[1]The 17th paragraph of the first codicil of the will provides:

17th. I give unto the trustees named in my will the most ample power to sell and dispose of any lands or other portion of my estate, and to exchange lands and otherwise dispose of the same; and to purchase land, and to take leases of land whenever they think it expedient, and generally to make such investments as they consider best; but I direct that my said trustees shall not purchase land for said schools if any lands come into their possession under my will which in their opinion may be suitable for such purpose; and I further direct that my said trustees shall not sell any real estate, cattle ranches, or other property, but to continue and manage the same, unless in their opinion a sale may be necessary for the establishment or maintenance of said schools, or for the best interest of my estate. I further direct that neither my executors, nor trustees shall have any control or disposition of any' of my personal property, it being my will that my husband, Charles R. Bishop, shall have absolutely all of my personal property of every description. And I give unto my executors named in my said will full power to sell any portion of my real estate for the purpose of paying debts or legacies without obtaining leave of Court; and to give good and valid deeds for the same, the purchasers under which are not to be responsible for the application of the purchase money.

[2]See *Estate of James Campbell,* 42 Haw. 586, 603 (1958); *Dowsett* v. *Hawaiian Trust Co.,* 47 Haw. 577, 581, 393 P.2d 89 (1964); *Richards* v. *Midkiff,* 48 Haw. 32, 60, 396 P.2d 49 (1964); *see also* 2 *Scott on Trusts,* 2d ed., sec. 187.

Fukushima, concerned about the Keauhou project necessitating outlay of capital expenditure, which in turn may deprive the Kamehameha Schools of much needed funds to properly maintain the schools, made this finding:

> [T]he financial situation of the Estate and of the schools, including the cash deficit now faced, was far more serious at the end of 1969 than at the beginning of 1968 when the Attorney General properly and wisely called a halt to continued transmutations in the development and financing schemes.

It should be noted that the trustees had petitioned the trial court for a bill of instructions and the judgment was entered on November 19, 1965. Judge Fukushima also found that under this judgment the trustees were:

> . . . authorized to form a development corporation, to convey the project lands to that corporation, to take stock and securities of the corporation for the current value of the land and to cause the corporation to develop, subdivide, sell and lease the lands in connection with the development. The Trustees were expressly prohibited from mortgaging or pledging assets of the Estate to secure any indebtedness of the corporation and were admonished to retain control of the corporation, meaning control of the development as well. Testimony in this case makes it clear that the increase in value to be added to the adjacent lands immediately mauka of the project lands was an element of substantial importance in the Trustees' decision to go forward with this development. In the Judgment, this Court also stated that the proposed plan was in conformity with the true intent of the Princess' Will and, to the extent it might constitute a deviation therefrom, authorized the consummation of the plan.

Further, Judge Fukushima found that pursuant to the judgment of November 19, 1965:

The Trustees have, indeed, formed the development corporation and have caused it to engage in the development and leasing of lands in the project. However, instead of causing it to be an independent developer with title to the lands, having its own substantial capitalization and sources of credit, which would assure insulation of the assets of the Estate from loss encountered in the project and also assure tax treatment which would not adversely affect the Estate as a whole, the Trustees have treated Kamehameha Development Corporation as an agency or division of the Estate, or as an alter ego, in the development. Kamehameha Development Corporation has never been made independent of the Trustees of the Estate, financially or otherwise. Not only have the majority Trustees failed to develop and implement any plan for financing the development from sources outside of the Bishop Estate, they have, to the contrary, committed the Estate to investing some $10½ million in capital in this project. That cash investment will be over and above the Estate's contribution of the project lands, which incidentally, have not yet been conveyed to Kamehameha Development Corporation. The current value of that land has not been ascertained nor has the land even been identified, although presumably it will be some or all of the project land lying makai of Alii Drive. The operating and capital requirements of the project have become inextricably intermingled with the operating and capital requirements of the Estate and the Kamehameha Schools. To fund all those requirements and to make up the cash deficits which are forecast, the Trustees now plan to sell some $19 million worth of Estate lands.

In my opinion the portions of the record referred to above show that the trustees recognized that the Estate was faced with a financial crisis and they decided it was necessary to sell a portion of the land belonging to the

Estate to relieve the Estate from the financial bind. It is crystal clear to me that the trustees made their decision to sell Post an undivided interest in the mauka area owned by the Estate under the original agreement to generate needed funds to maintain the Kamehameha Schools, and/or for the best interest of the Estate. Thus, I believe that the record disproves the reason or ground upon which this court is basing its decision and therefore that it is an incorrect decision.

Probably I should end my dissent here; however, I am constrained to discuss another issue for the reason that this court, after acknowledging that though its ruling on the issue "with regard to the appraisals of Won and Child" to be dictum, chose to discuss the matter.

On this issue, this court acknowledges the professional competence of Won and Child as appraisers. However, it faults their appraisals on the ground that they were requested and they did make the appraisals of both "the mauka area and the makai area as of July 1, 1968, under certain assumptions, one of which was that the two areas be deemed to be under a single ownership." On July 1, 1968, both mauka and makai areas were owned by the Estate and the appraisals were based on factual basis and I cannot see how such appraisals can be faulted by this court.

Also, this court finds fault on the part of the trustees in that when the Bishop-Post agreement, which agreement is in issue here, was entered into on December 29, 1969, the sales price of the land to Post was determined on the appraisals of Child and Won as of July 1, 1968. The appraisals were the basis upon which Bishop and Post originally entered into an agreement[3] on July 1,

---

[3]This agreement provided for the organization of a joint venture between Post and Kamehameha Development Corporation, owned solely by the Estate. Post, under the agreement, was required to contribute $2,500,000 in cash and in addition contribute undivided interest in land to be purchased from the Estate valued at $2,500,000.

1968. This original agreement was twice amended by the parties, by Implementation Draft No. 2 dated August 20, 1968, and Implementation Draft No. 3 dated December 19, 1968.

The record shows that in accordance with the terms of Implementation Draft No. 3, on December 30, 1968, Post paid $780,000 as prepaid interest and offered to pay $1,250,000 as down payment for the mauka area upon delivery of a limited warranty deed.

The trustees, instead of performing under Draft No. 3, entered into renegotiation with Post. The trustees probably took the step to renegotiate because they thought that the agreement would not be binding upon the Estate; that they would be able to get a better bargain for the Estate under a new agreement; that, as this court holds, by Implementation Draft No. 3, they had "severely curtailed the liquid financial resources available for the use of the Kamehameha Schools"; or that by the agreement they had made the Estate a joint developer and thereby subjected the Estate to payment of taxes.

Now, with these problems facing them, the trustees, in their exercise of prudent judgment, entered into the Bishop-Post agreement and KDC-Post agreement to alleviate the problems. In reaching this decision, it is clear to me that at that point the trustees again made a "determination that an agreement is better than the agreement previously executed, *with no binding force* on the estate and as to which the majority trustees entertained enough reservation to form a desire not to go through with it, is not a determination that the sale mentioned therein is for the best interest of the estate." (Emphasis added.)

Also, I do not agree with the statement of this court that the previously executed agreement had no binding effect. The binding effect of Implementation Draft No. 3 may have been questionable; however, the trustees

chose not to have the matter litigated, probably to save costs and expenses to the Estate, and entered into the Bishop-Post and KDC-Post agreements. In doing so, the parties purposely avoided litigation of the question and the issue was not before the trial court and is not now before this court. Under the record, this court is in no position to hold that the previous agreement was not binding on the Estate.

This court holds that the trustees abused their discretion when they determined the sales price of the mauka land based on appraisals made by Won and Child as of July 1, 1968; and that the price should have been based on appraisals updated to the date of the Bishop-Post agreement. It should be noted here that the original agreement dated July 1, 1968, and as amended by Implementation Draft No. 3, was being cancelled and replaced by the Bishop-Post agreement. The latter agreement was to be effective as of July 1, 1968, the date of the original agreement. In fact, July 1, 1968 was the effective date of all of the agreements which amended the original. This would necessarily be so inasmuch as the parties to the agreements intended the later amendments or agreements to amend or replace the original agreement and to be effective as of the original date—July 1, 1968. Under the circumstances, it was proper to have the sales price determined or appraised as of that date.

This court concedes that the trustees of the Bishop Estate "are vested with a discretion to act in regard to the sale and disposal of land . . . and . . . a court of equity should not intervene unless it is made to appear that the trustees are abusing the discretionary powers vested in them." *Hyde* v. *Smith,* 11 Haw. 535, 538 (1898).

In determining questions of trustees' discretion regarding the disposal or investment of trust assets, this court has in the past used as a criterion the "prudent investor rule" and said:

"In acquiring, retaining, exchanging, selling, investing, reinvesting and managing property of another, including investments for account of their trusts by trust companies acting as trustees or guardians, a trust company shall exercise the judgment and care which, *under the circumstances then prevailing,* men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds and property considering both probable income and probable safety of capital." (Emphasis added.) *Dowsett* v. *Hawaiian Trust Co.,* 47 Haw. 577, 583, 393 P.2d 89, 94 (1964).

Also, the rule of this court is that where a trustee has sold land under the power of sale, "the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment. The mere fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power by the trustee." *Estate of James Campbell,* 42 Haw. 586, 604 (1958).

However, after a careful analysis of this court's decision and its criticism of the trustees' actions, I fail to see where this court has shown in any way that the trustees had abused their discretionary power of sale under the will. At the most, this court is saying that if it were the trustees, it would not have executed the Bishop-Post agreement. In other words, it is substituting its judgment for the trustees' judgment. This court's decision, I believe, overrules *Estate of James Campbell* quoted above.

The decision of this court, in my opinion, would nullify the very purpose or objective of the testatrix in granting the trustees broad power of sale, as the decision

of this court reverses an honest determination of the sales price made by the trustees in their exercise of the power of sale. The result of this decision would compel trustees not to sell property of estates under the power of sale, but to petition the court in the first instance for license to sell, which would frustrate purchasers and bring about delay and larger expenses, the result of which may reduce the marketability and price of land held by trustees.

As has been noted, the trustees had petitioned the court for a bill of instructions to permit them to form a development corporation, as they had doubts as to their authority to do so under the terms of the will, and the judgment of November 19, 1965 authorized the formation of the corporation. It is correct that the sale of land was not authorized by the trial court's judgment. However, the sale of land was not and should not be deemed in violation of that judgment. Under the power of sale contained in the will, the trustees had wide discretion to sell land belonging to the Estate and they agreed to sell the land to Post by virtue and pursuant to such power and not presumably under the judgment.

I believe that the decision of this court declaring the Bishop-Post agreement invalid deprives Post of his rights and interests under the agreement without due process of law. He was not made a party to the proceeding and this court holds that he was not a necessary party for the court to render the decision declaring the Bishop-Post agreement invalid. In support of this holding this court cites *National Licorice Co.* v. *National Labor Relations Board,* 309 U.S. 350 (1940). The U.S. Supreme Court has held that NLRB properly enjoined an employer from enforcing contracts entered into with its employees in violation of the National Labor Relations Act, though the employees were not parties to the proceeding. This court says that "[i]n affirming the order of the board, the United States Supreme Court stated that the order did 'not go beyond those in suits brought by the United

States to restrain violations of the Sherman Act, where the injunction was broad enough to prevent the offender from carrying out contracts with persons not parties to the suits,' and also stated that 'in proceedings before the Federal Trade Commission, the order restraining unfair methods of competition may preclude the performance of outstanding contracts by the offender.' (309 U.S. 365, 366) ."

Also this court says that "[i]n the advisory committee notes to the 1966 amendment of Rule 19 of the Federal Rules of Civil Procedure, it is stated:

> 'Even if the court is mistaken in its decision to proceed in the absence of an interested person, it does not by that token deprive itself of the power to adjudicate as between the parties already before it through proper service of process. * * * It is true that an adjudication between the parties before the court may on occasion adversely affect the absent person as a practical matter, or leave a party exposed to a later inconsistent recovery by the absent person. These are factors which should be considered in deciding whether the action should proceed, or should rather be dismissed; but they do not themselves negate the court's power to adjudicate as between the parties who have been joined.' 3A Moore's Federal Practice, 2d ed., § 19.01 [5.-11] (1967) ."

The trial court held and now this court is holding that the Bishop-Post agreement is invalid, and thereby wiping out Post's rights and interests under the agreement. On the other hand, if the decision of the court merely enjoined the trustees from carrying out the terms of the agreement, *National Licorice Co.* v. *NLRB* and the quotation from Moore's may be applicable here; however, the decision invalidates the agreement, and I believe the authorities cited by this court are inapposite.

Inasmuch as the decision of this court deprives Post

of his rights and interests, he was a necessary party to the proceeding; and therefore he is deprived of his day in court in violation of the due process clause of the United States and Hawaii State Constitutions. Thus, I would enter a most strenuous dissent on this point.

---

DISSENTING OPINION OF RICHARDSON, C.J.

I respectfully dissent.

The Bishop-Post agreement can be sustained as a prudent trustee action under the will of Bernice Pauahi Bishop.

The majority arrived at its conclusion regarding the Bishop-Post agreement by a two-step process. First, the majority states that "the Bishop-Post agreement must stand on its own merits, independently of the KDC-Post agreement and without regard to any consideration based on the majority trustees' prior dealings with Post. Secondly, the majority finds that the Bishop-Post agreement cannot stand on its own merits and is, therefore, invalid.

I am not persuaded by the majority's reasoning on either point.

The majority reasons that "the Bishop-Post agreement must be capable of withstanding scrutiny independently of the KDC-Post agreement because the obligation of the trustees to make the conveyance thereunder is not conditioned on the performance of Post's obligations in the KDC-Post agreement." In other words, because the probable benefits to the estate of the KDC-Post agreement were not technically a part of the Bishop-Post agreement, they must be disregarded entirely by the court in evaluating the prudence of the trustees' action in undertaking the Bishop-Post agreement. This reasoning can only be based on a view of trustees' fiduciary duties that is, in my opinion, unduly restrictive.

As the majority concedes, the trustees of the Bishop

Estate "are vested with a discretion to act in regard to the sale and disposal of land, . . . and . . . a court of equity should not intervene unless it is made to appear that the trustees are abusing the discretionary powers vested in them." *Hyde* v. *Smith,* 11 Haw. 535, 538 (1898).

In determining questions of trustee discretion regarding the disposal or investment of trust assets, this jurisdiction has in the past used as a criterion the "prudent investment rule" set forth in *Dowsett* v. *Hawaiian Trust Co.,* 47 Haw. 577, 583, 393 P.2d 89, 94 (1964) as follows:

> In acquiring, retaining, exchanging, selling, investing, reinvesting and managing property of another,including investments for account of their trusts by trust companies acting as trustees or guardians, a trust company shall exercise the judgment and care, which, *under the circumstances then prevailing,* men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds and property considering both probable income and probable safety of capital. *Dowsett* v. *Hawaiian Trust Co.,* 47 Haw. at 583, 393 P.2d at 94 (emphasis added).[1]

Application of this rule clearly requires consideration of factors external to the sale of property in judging a trustee's action, and it was so applied in both *Dowsett* v. *Hawaiian Trust Co., supra,* and its companion case, *Steiner* v. *Hawaiian Trust Co.,* 47 Haw. 548, 393 P.2d 96 (1964).

According to the law of this jurisdiction prior to this case, then, the benefits which were likely to accrue even-

---

[1]Although the cited statement is a quotation of a statute, R.L.H. 1955, § 179-14, now HRS § 406-22, this court in *Dowsett* cited the statute only because it "best stated" the "prudent investment rule", 47 Haw. at 583, which is a common law rule. *Cf.* Scott, *Trusts,* § 227, 1805-1806 (3d ed. 1967). Although in *Dowsett* this court was concerned with the actions of a trust company, the "prudent investment rule" applies equally to the trustees of the Bishop Estate.

tually to the estate from the KDC-Post agreement were a proper element to be considered in judging the trustees' evaluation of the Bishop-Post agreement. The majority's holding that this was improper has no basis in law and will, in my opinion, have the unfortunate consequence of severely restricting trustee investments in this jurisdiction.

The majority also states that "the Bishop-Post agreement must be capable of being sustained as a prudent trustee action under the will without regard to the original agreement or anything which previously transpired between the majority trustees and Post, for the reason that the original agreement had no binding effect on the estate without the approval of the circuit court."

The majority offers three reasons why the submission of the original agreement to the circuit court was necessary to give that agreement binding effect. First, it is stated that "the development of the portion of the mauka area outside of the boundaries of the project lands is not within KDC's authority under the judgment."

I disagree.

Paragraph 2 of the judgment provides "the corporation, when formed, will engage in the business of development, subdivision, sale, leasing of the real property conveyed to it and in general will have authority to do all things relating to the development of said lands which are customarily done by similar business corporations . . . ." The original KDC-Post agreement provides for the joint development of the lands described in the judgment and another piece of land, the land to be sold to Post. It is clear to me that this is a "thing relating to the development of [the lands described in the judgment] which [is] customarily done by similar business corporations" and consequently is within KDC's authority under the judgment.

The majority uses paragraph 8 of the judgment, which states that "to develop other *lands of the estate*,

the trustees are authorized to form corporations for said purposes, subject to . . . approval by the court prior to their formation" (emphasis added), as support for its contention that KDC is not authorized to engage in a joint development which will include all of the land sold to Post. The original agreement did not contravene paragraph 8, however, for the reason that the agreement did not require KDC to develop any *lands of the estate* other than those described in the judgment. The land to be developed, other than that described in the 1965 judgment was to be land not of the estate, but rather land which by the time the development agreement took effect would be owned by Post. The original joint venture agreement, then, was entirely within KDC's authority under the 1965 judgment.

The majority follows a circuitous route in presenting its other two reasons for requiring the submission of the original agreement to the circuit court. The majority states that the trustees' actions, in joining in an agreement which made KDC an equal participant with Post in the joint development of the entire mauka area and in agreeing to the formula of allocation of the improvement cost of the makai area, were "questionable" as prudent trustee actions. The questionableness of each action is a separate reason for requiring the submission of the original agreement to the circuit court.

Even if the majority's view on the questionableness of the trustees' actions is accepted, their reasoning does not support their position. The majority asserts that since the original agreement was the result of an abuse of discretion by the trustees, it was not binding on the estate and therefore, not to be considered by this court in evaluating the prudence of the trustees' action in entering into the Bishop-Post agreement. In order for this to be so, however, we must say that the trustees' actions constituted a clear abuse of discretion, which would have led a court ineluctably to hold the original agreement in-

valid. If the actions were merely "questionable", there would exist the possibility that if referred to a court the agreement would be upheld and that Post would then insist on performance. If such were the case, the estate would be in a worse position than if the trustees did not submit the agreement to the court but instead negotiated a superseding agreement more advantageous to the estate, which is what the trustees in fact did. Even if the trustees' actions were "questionable", then, in judging the prudence of the Bishop-Post agreement we must allow that it was reasonable for the trustees to consider the possibility that the original agreement was binding on them.

We come now to the question of whether entering into the Bishop-Post agreement constituted an abuse of discretion on the part of the trustees. The majority's first contention on this point is that "the majority trustees executed the Bishop-Post agreement upon a determination that the sale mentioned therein was necessary for the capital or operational requirements of the Kamehameha Schools [only in that it] was a means to free the estate from the original agreement." The majority feels that the determination was insufficient, and proclaims that "[a] determination that an agreement is better than the agreement previously executed, with no binding force on the estate and as to which the majority trustees entertained enough reservation to form a desire not to go through with it, is not a determination that the sale mentioned therein is for the best interest of the estate."

In my view, the majority's position is utterly untenable. The majority is again basing their argument on a post facto disagreement with the reasonableness of the trustees' determination of the benefits of the original agreement. For the reasons discussed above, I disagree with the majority's premise that the trustees should have acted as though the original agreement had no binding

force on the estate. Once the premise is discarded, it is clear that the trustees' execution of a subsequent agreement, concededly more advantageous to the estate, was based on a determination that the sale mentioned therein was for the best interest of the estate.

Finally, we come to the issue of the sale price of the lands to be sold to Post under the Bishop-Post agreement. The majority reasons that the Bishop-Post agreement must be judged as if the KDC-Post agreement didn't exist and as if the majority trustees' prior dealings with Post had never occurred. If this were so, using a July 1, 1968 appraisal figure as the price for a December 29, 1969 agreement would indeed be inexplicable and a patent abuse of discretion on the part of the selling trustees. As explained above, however, the majority's refusal to appreciate the total factual picture is not based on a sound view of the law and therefore, the Bishop-Post agreement must be judged in view of the circumstances leading up to and concomitant with the transaction. Some of these circumstances were: the estate's shortage in cash and income flow; the benefits which would accrue to the estate from the KDC-Post transaction; the fact that an earlier agreement had been negotiated with Post on which he had been ready to perform since January 1969; the fact that the development project was a potentially large revenue source for the estate; and the fact that the estate-owned lands mauka of the Post lands, hitherto of negligible value, would greatly increase in value as a result of the projected development. In view of these circumstances, the 1968 appraisal value was a price that a reasonably prudent businessman would have settled for were he in the position of the trustees.

The Bishop-Post agreement, then, constituted a prudent trustee action under the will of Bernice Pauahi Bishop. In my opinion, the circuit court erred in disapproving the agreement and ordering the trustees not to effect the sale of land mentioned therein.

I agree with the majority that "[t]he function of the attorney general, as *parens patriae* of charitable trusts, is to oversee the activities of the trustees to the end that the trust is performed and maintained in accordance with the provisions of the trust document, and to bring any abuse or deviation on the part of the trustees to the attention of the court for correction. *Hite* v. *Queen's Hospital*, 36 Haw. 250, 262 (1942). The authority of the attorney general over charitable trusts does not extend beyond the performance of that function. M. R. Fremont-Smith, *Foundations and Government*, 198 (1965)."

To conclude, I feel that the majority's reasoning upon analysis is revealed to be basically a mere criticism of the considered judgment of intelligent, conscientious trustees. The majority of this court has substituted its judgment for that of the trustees. As a result of this decision, the trustees of Bishop Estate and of other trust estates in this jurisdiction will find themselves hamstrung in their business dealings by a fear of constant critical scrutiny by courts possessed of the perfect vision of hindsight. This will be a highly unfortunate result of an unfortunate case.

I would reverse.